**In re KAYLA H. et al.**

[Cite as *In re Kayla H.*, 175 Ohio App.3d 192, 2007-Ohio-6128.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–06–1376.

Decided Nov. 16, 2007.

Donna M. Grill, for appellants.

Dianne L. Keeler, for appellee, Lucas County Children Services.

———————

SKOW, Judge.

{¶ 1} Appellants, Sarah H. and Todd H., husband and wife, appeal the judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated their parental rights to Kayla H. and Joshua H. For the following reasons, the judgment is affirmed.

{¶ 2} On March 4, 2005, Lucas County Children Services ("LCCS") filed an emergency shelter-care request for the children.[1] The petition alleged that on February 25, 2005, Sarah and Todd left the children with a babysitter for the evening and returned home around 10:00 pm. The next morning, Joshua, then three months old, could not eat, vomited repeatedly, and was cold and listless. Appellants called an ambulance; EMS responders took him to a hospital, where he was placed in intensive care and diagnosed with a subdural hematoma, consistent with shaken-baby syndrome. The magistrate, finding that Joshua was about to be released from the hospital, granted LCCS's ex parte request.

{¶ 3} On March 7, 2005, LCCS filed a complaint in dependency, neglect, and abuse for both children, requesting temporary custody. The complaint alleged that Dale H., the children's uncle, was babysitting the evening prior to Joshua's hospitalization. Neither Sarah nor Todd could explain Joshua's injury. LCCS added an allegation that Todd was a registered sex offender.

{¶ 4} On March 9, 2005, a magistrate awarded temporary custody to LCCS, based on appellants' consent, finding that the continued residence of the children in appellants' home was contrary to their best interest due to Joshua's injury and unspecified "housing conditions." The custody award also ordered Dale H. to have no contact with the children and forbade appellants to allow him any contact with the children.

{¶ 5} On March 31, 2005, LCCS filed a case plan with services for appellants, which included interactive parenting and therapy. With respect to Todd's sex-offender status, the case plan provided: "[Todd] is a registered sex offender who has not completed any treatment. He doesn't appear to have any remorse or thought for the crime he committed against a minor child. [Sarah] doesn't appear to have any concerns for her children or understand the seriousness of

———————

1. At the beginning of this case, appellants also had custody of Jonathan E., Sarah's child from a previous relationship and the children's half-brother. Jonathan's natural father was granted custody on his motion during the pendency of this matter.

Todd's crime. Todd will address his offenders [sic] issues in therapy. Todd and Sarah will learn the indicators and triggers of sexual abuse. Todd will specifically address his triggers for offenders. Sarah will specifically learn indicators of offending behaviors. Todd and Sarah will attend sexual offenders group * * *. Progress will be measured by parent's level of involvement in any/all identified services and activities."

{¶ 6} On April 11, 2005, the trial court entered a consent judgment adjudicating Kayla a dependent child and Joshua a dependent and abused child. Dale H. was again ordered to have no contact with the children. Sarah and Todd were each ordered to pay child support to LCCS in the amount of $50 per month. The case plan filed March 31, 2005, was approved but amended to eliminate the sexual-offender treatment and counseling for Todd in lieu of his signing information releases.

{¶ 7} On June 23, 2005, LCCS filed an amended case plan. Although the consent order had amended the case plan to eliminate sexual-offender treatment for Todd, the new case plan reinstituted sexual-offender therapy and counseling for him, stating: "[Todd] will learn the dynamics of sexual offending and he will not abuse any other individual. He will learn to show empathy for victims, and he will work through his issues successfully. He will complete SOT [sexual-offender-treatment] services, * * * follow treatment recommendation, * * * and demonstrate progress."

{¶ 8} On December 21, 2005, an administrative review noted that Todd had spent five months in SOT, "attending on a regular basis," and that five to six months remained before SOT was completed. Todd also completed a 12–week parenting group with therapist involvement, and the parent educator reported only that he "did well." Sarah attended all parenting classes, and observation noted "interaction and bonding good" between Sarah and the children. Caseworkers reported that Sarah completed the classes successfully, and the parent educator had "no concerns." Both Sarah and Todd successfully completed a five-week parenting workshop. Todd was ineligible for LCCS's parenting classes, but he completed a parenting class through Crossroads Church.

{¶ 9} On March 27, 2006, a magistrate filed an annual review entry, which noted that a caseworker reported LCCS's intention to file for permanent custody of the children. The trial court's review of the magistrate's decision stated: "Case plan services for mother: Diagnostic assessment—no recommendation; Parenting—passed and successfully completed; Protective case issues at Unison—passed; Father sexual offender treatment, Unison—completing in a month; Crossroads—completed; Parents visiting at agency. Continue to have concerns of mother protecting children with regards to father being a registered sexual offender. Goal: Reunification to be changed to permanent custody/adoption."

{¶ 10} On May 2, 2006, LCCS filed its motion for permanent custody. The motion was based on Todd's sexual offenses, Sarah's alleged inability to protect her children from Todd, and Sarah's alleged refusal to consider separating from Todd. On July 11, 2006, the guardian ad litem ("GAL") filed his report, recommending that LCCS be granted permanent custody of the children. On October 3, 2006, the matter proceeded to disposition.

{¶ 11} At the outset, Todd's attorney objected to any testimony relating to Todd's convictions for sex offenses on grounds of relevance, because LCCS had made no allegations that the children were sexually abused. LCCS argued that testimony regarding his convictions was relevant to show that the risk he presented to the children had not been lowered. The court overruled the objection solely on the basis that Todd was a registered sex offender.

{¶ 12} A docket sheet containing Todd's criminal history was admitted into evidence. In 1991, Todd pleaded guilty to two counts of gross sexual imposition and one count of illegal use of a minor in nudity-oriented materials and was sentenced to an indefinite term of four to 15 years' incarceration. Todd was originally charged with six counts of gross sexual imposition, felonies of the third degree, two counts of felonious sexual penetration, felonies of the first degree, one count of disseminating matter harmful to juveniles, a felony of the fourth degree, and five counts of illegal use of a minor in nudity-oriented materials, felonies of the second degree.

{¶ 13} In 1998, the sentencing court held sexual-offender-classification hearings pursuant to 1996 Am.Sub.H.B. No. 180 and classified Todd as a sexual predator (the most severe designation). On appeal, this classification was reversed and vacated; after a subsequent hearing, he was classified as a sexually oriented offender (the least severe designation) with the victim under age 13 and ordered to register annually for ten years. His probation was terminated as "successfully completed" in January 2003.

{¶ 14} LCCS called Leonard Beck, a unit manager with the Lucas County Pretrial Sentence Department, formerly Todd's probation officer. Beck had also written the LCCS investigative caseworker a letter detailing his role in Todd's supervision, which was admitted into evidence. Beck wrote that Todd had been unsuccessfully terminated from the therapy component of community control, as he was not able to progress from the "deniers' group" in therapy. While Todd did not deny, per se, his offenses, he did not share or talk in group therapy unless directly confronted. For example, Todd did not tell the group that he was engaged to marry Sarah until group members saw the marriage license in the newspaper, because he believed it was "none of their business." Beck opined, based on his experience, that Todd was at "extremely high risk" to reoffend and that probation had done nothing to lower the risk.

{¶ 15} Lenice Little began supervising Todd's probation in May 2002 and continued until Todd had completed probation. She noted that Todd's "successful" completion of probation meant that he had complied with the court's conditions, not that he had successfully completed sexual-offender therapy. Of concern was Todd's refusal to acknowledge that living in a home with Sarah's son, Jonathan, presented a "high risk situation as a target aged child of his preference."

{¶ 16} Nancy Larson, qualified by the court as an expert in sexual-offender treatment and therapy, rendered therapy to Todd for the five years of his probation. She had concluded that Todd did not successfully complete the therapy component of his probation. Also qualified to diagnose, she assessed Todd's psychological pathology as that of a classic pedophile, with a primary sexual attraction to children that would not change. She defined a pedophile as one "who has a primary sexual orientation that they find sex with minor children the most gratifying sexual experience that they have. It does not preclude that they may be married and engaged in sexual relations with an adult peer, same or opposite sex. But it is a fixation for them that there is a preferred sexual object and if give a choice, sexual experiences would be sought with that class and category of a person." She classified the risk he presented to children as high and explained that, in five years of therapy, Todd had not been willing to understand the risk he presented and take steps to mitigate it. She did note that a diagnostic risk-assessment test scored Todd's risk of reoffending as moderate. Given the diagnosis of pedophilia, however, she recommended that he have no unsupervised contact with minor children.

{¶ 17} On cross-examination, she did admit that a number of sex offenders, including those whose victims were children or their own children, do reunite with their families. The process is gradual, involves the entire family in counseling, and requires a safety plan before the offender can cohabit with children. She would not, however, recommend family reunification for an offender diagnosed with pedophilia, although she had worked with some pedophiles who she believed could safely have families. In order for an offender to cohabit, she explained, the family first must "truly [be] able to understand that theirs is a lifelong problem and it's not ever going to go away and that the vigilance that's necessary would have to be extreme. * * * I think the idea of living in separate habitats is a more realistic plan * * *."

{¶ 18} William Emahiser, a sexual-offender counselor at Unison, a behavioral-health clinic, qualified as an expert in sexual-offender treatment, oversaw Todd's LCCS-ordered treatment for nine months and counseled Sarah individually per LCCS's case plan. During this therapy, Todd wrote a "victim empathy letter impact statement" in which he admitted the acts underlying his 1991 convictions.

Emahiser testified, however, that victim empathy was not one of Todd's strong suits. The letter was introduced into evidence, along with all of the written work Todd completed in therapy, including relapse-prevention strategies, goals, "adaptive coping responses," and a support-person list. Based on this work, Emahiser testified that Todd was at risk whenever engaged "in any kind of behavior around or with children, since his victim was a five year old child." He continued: "[A]ny contact with children increases his risk of reoffending and definitely behavior of or acting in a—acting in a way that would—most of us would consider, such as bathing or dressing, states of undress, those kinds of things he should never engage with his own children or with anyone's children for that matter. * * * Any time [Todd] has access to children, it's going to increase his risk of reoffending." A previous counselor had performed a sexual-offender risk diagnostic test for Todd, on which Todd scored a "medium, low" risk of reoffending. Ultimately, Emahiser opined that Todd had successfully completed therapy.

{¶ 19} Emahiser also testified regarding an incident during supervised visitation at LCCS between Todd and Kayla. A caseworker reported that Todd had Kayla "straddled" across his lap and had to intervene to remove her from his lap. In therapy, Emahiser confronted Todd with how this behavior was not only inappropriate but increased his risk of reoffending; Emahiser testified that all patients are instructed to severely limit their physical contact with children. On cross-examination, he explained that not only does having a child on Todd's lap look inappropriate, but it is more akin to sending "an alcoholic to go work as a bartender." With respect to attempts to reunify Todd into a household with his children, severe physical boundaries would be necessary to separate Todd from physical interaction or unsupervised interaction with the children.

{¶ 20} With respect to Sarah's therapy, Emahiser asked her whether she would consider separating from Todd; Sarah told him that she was very conflicted and she hoped she would not have to make that decision. He then instructed her to ask LCCS whether separating from Todd would increase her chances of keeping custody of her children; Sarah informed him that she was told that "there would be no impact one way or the other." Since Todd had identified Sarah as his primary support person in his relapse-prevention plan, Emahiser questioned and counseled her as to what was necessary to prevent Todd from relapsing. At first, Sarah was unable to identify high-risk factors and behaviors that Todd should not engage in with children. Emahiser confronted both Todd and Sarah with his concern that Todd had identified a primary support person who was unable to identify risks and successfully implement the safety plan. Todd and Sarah were "successfully" discharged from the treatment program at that point because Todd, at least, demonstrated an understanding of his relapse-prevention plan, and

they "cannot hold the offender accountable for the performance of their support person."

{¶ 21} A week later, Sarah contacted Emahiser, apologized, and asked for another chance to learn. Approximately two months later, Sarah re-engaged in therapy with Emahiser and had another three to four sessions. When Emahiser reassessed her ability to follow a safety plan, she was able to "regurgitate" the plan information and demonstrated a rote memorization of the concepts. With respect to the incident in which Kayla straddled Todd's lap, Sarah understood—after therapy—why such contact dangerously increased Todd's risk of reoffending.

{¶ 22} Emahiser also wrote a letter, at the request of LCCS, stating that Sarah had successfully completed individual counseling. He concluded that she had developed a plan to keep her children safe, demonstrated an ability to identify high-risk behaviors in Todd, and "developed specific strategies to minimize the risk" of harm to her children.

{¶ 23} As for what would be required were Todd and Sarah to jointly cohabit with the children: Emahiser instructed Sarah about the use of alarms in the house, placed on the outside of Todd's bedroom and the inside of the children's bedrooms; Sarah would have to ensure constant supervision. Locks should be used on the children's doors as they age, and they should understand how to use them. A home-based therapist who specializes in sex-offender treatment could perform home visits to ensure that the home was safeguarded and work to increase the children's understanding of physical boundaries. Emahiser acknowledged that he usually does not advocate family reunification, as it is extremely difficult. The offender cannot be unsupervised in the same room with children, and "it really puts a strain on the significant other to be everywhere all at once."

{¶ 24} Wanda Cannon, the LCCS caseworker assigned to appellants, testified that no additional services were recommended for Sarah. Sarah successfully completed the LCCS parenting classes, including interactive parenting, and sex-offender counseling with Emahiser. Because Todd is a sex offender, he was ineligible for LCCS's parenting classes; instead, he completed a noninteractive parenting class through Crossroads Church, which covered basic needs.

{¶ 25} With respect to the appellants' housing conditions, Cannon said she never saw the types of alarms that Emahiser had recommended. When she investigated the reasons Joshua was cold when his injury occurred, appellants told her that they had to keep the temperature between 54 and 64 degrees to save on heating bills, and having the temperature higher was not an option for them. Cannon mentioned no other issues with respect to providing the children food, clothing, suitable housing, or medical care. She acknowledged that Todd was employed and that the children's basic needs were met.

{¶ 26} Cannon explained that even though appellants had completed the case plan services, "there continued to be an unidentified perpetrator to the physical abuse, * * * the shaken baby syndrome with Joshua, * * * and the sexual offending behaviors for Todd * * *. And the fact he is a convicted sexual offender who was hesitant to complete treatment and then when he did complete treatment he did so with there still being regards and concerns from the then therapist that was working with him." LCCS did not allege that Todd sexually or physically abused the children; Cannon acknowledged that neither Jonathan, Sarah's older son, nor Kayla had indicated that Todd had abused them, sexually or physically, nor had there been any other allegations of abuse of any child.

{¶ 27} Christopher Cottle, the children's guardian ad litem, filed a report recommending a grant of permanent custody of both children to LCCS. He wrote that if Joshua's shaken-baby syndrome was the only concern, reunification would still be possible because no perpetrator was identified. His primary concern was Todd's status as a sex offender and his diagnosis of pedophilia. With respect to Sarah, his concern focused on her inability to protect the children from Todd. Todd and Sarah had, at one point, suggested separating in order to regain custody; however, they indicated to Cottle that they were not planning to divorce and eventually would reunite as a family. His recommendation of permanent custody rested on the high risk of sexual abuse to the children presented by appellants continuing to cohabit with the children.

{¶ 28} The trial court granted the motion for permanent custody, finding it in the children's best interest and finding that the children could not be reunited with their parents then or within one year. With respect to Todd and Sarah's unfitness, the judgment stated: "In making these findings, the Court observes that the father's relapse prevention plan is flawed; the Court especially notes that there is shallow empathy shown in the development of the plan, and the support persons chosen to guard against relapse are inadequate. * * * The Court also has considered the fact that [appellants] have chosen to remain together as a couple and advocate for return of the children to a home they will maintain together. The Court finds that this would not be a safe environment for these children and specifically finds that the reasons for removal cannot be remedied when one of the parents is diagnosed with sexual offending behaviors such as [Todd] exhibits, which diagnoses include that of sexual predator."

{¶ 29} Appellants timely appealed and have submitted one assignment of error for review:

{¶ 30} "The trial court erred in granting permanent custody to Lucas County Children Services Board as Lucas County Children Services Board failed to show by clear and convincing evidence that it is in the best interest of the minor child that permanent custody be awarded to Lucas County Children Services Board

and they failed to prove by clear and convincing evidence Ohio Revised Code sections 2151.414(E)(1), (2), (4), (14) and (16)."

{¶ 31} "A termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows." *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Ohio courts have long held that a parent who is a suitable person has a paramount right to the custody of his or her child. *Clark v. Bayer* (1877), 32 Ohio St. 299, 310; *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. "A parent's right to raise his or her children is an 'essential' and 'basic' civil right. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." (Citations omitted.) *In re Sheffey*, 167 Ohio App.3d 141, 2006-Ohio-619, 854 N.E.2d 508, ¶ 22. For this reason, a court "may not award custody to [a] nonparent without first making a finding of parental unsuitability." *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, syllabus. See also *In re D.A.* 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 8–11.

{¶ 32} Parental unsuitability is demonstrated by clear and convincing evidence supporting findings pursuant to R.C. 2151.414(E). A parent's rights may not be terminated unless the court finds evidence (1) that the child "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," R.C. 2151.414(B)(2), and (2) that a grant of permanent custody of a child to a children's service agency is in the child's best interests. R.C. 2151.414(B)(1). Findings pursuant to both R.C. 2151.414(E) and (B) are required, and all findings must be supported by clear and convincing evidence sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus; *In re William S.* (1996), 75 Ohio St.3d 95, 661 N.E.2d 738.

{¶ 33} To establish the first prong, that the children cannot be placed with a parent within a reasonable amount of time, a court must determine by clear and convincing evidence that at least one of the 16 statutory factors of R.C. 2151.414(E) exists. If one or more of the factors are found to exist, the court is required to find that the children cannot be placed with the parent within a reasonable time. Id. As to Todd, the trial court found applicable the factors of R.C. 2151.414(E)(1), (2), (4), (14), and (16). As to Sarah, the court found the factors of R.C. 2151.414(E)(1), (4), (14), and (16). Those sections state:

{¶ 34} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 35} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

{¶ 36} " * * *

{¶ 37} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

{¶ 38} " * * *

{¶ 39} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 40} " * * *

{¶ 41} "(16) Any other factor the court considers relevant." R.C. 2151.414(E).

{¶ 42} The statute also enumerates certain criteria for evaluating whether permanent custody with a children services agency is in the child's best interests. R.C. 2151.414(D)(1) through (4). A court's findings regarding the children's best interests must also be supported by clear and convincing evidence, R.C. 2151.414(B) and *In re William S.,* supra, and will not be overturned as against the manifest weight of the evidence if the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. *In re S.* (1995), 102 Ohio App.3d 338, 344–345, 657 N.E.2d 307; *Cross v. Ledford,* supra.

{¶ 43} LCCS argues against the application of the R.C. 2151.414(E) factors to either Todd or Sarah. Instead, LCCS argues, because the children were adjudicated dependent and abused, the court may consider only the children's best interests, citing *In re D.R.*, 153 Ohio App.3d 156, 2003-Ohio-2852, 792 N.E.2d 203. That case, however, and the Ohio Supreme Court's subsequent settling of a conflict among appellate courts, *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, clearly apply this rule only to transfers of legal custody, not permanent-custody proceedings. "Legal custody where parental rights are not terminated is not as drastic a remedy as permanent custody." *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶ 6, quoting *In re A.W.-G.*, 12th Dist. No. CA2003–04–099, 2004-Ohio-2298, 2004 WL 1040696, at ¶ 7. In legal-custody transfers, unlike termination-of-parental-rights matters, "[p]arents retain residual parental rights and have the opportunity to request the return of their children." Id.

■ {¶ 44} Because permanent-custody proceedings divest parents of all rights, privileges, and responsibilities, *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, paragraph one of the syllabus, a finding of parental unfitness pursuant to R.C. 2151.414(E) is mandatory. *In re William S.* (1996), 75 Ohio St.3d 95, 661 N.E.2d 738, syllabus. LCCS must prove that Todd and Sarah are separately unfit, because the "termination of parental rights should be an alternative of 'last resort.' *In re Cunningham* (1979), 59 Ohio St.2d 100, 105, 13 O.O.3d 78, 391 N.E.2d 1034." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11.

■ {¶ 45} We first review the trial court's findings pursuant to R.C. 2151.414(E) with respect to Todd. With respect to R.C. 2151.414(E)(4) and (14), there is simply no evidence that Todd was unwilling to provide an adequate home for the children. LCCS argues that his unwillingness to move apart from the children in order to protect them from the risk that he might, possibly, sexually abuse them demonstrates his unwillingness to provide them with a permanent home. Todd made efforts, however, through therapy, to provide a home for the children in which his pedophilia was ameliorated. LCCS did not allege that he sexually abused the children or failed to protect them from abuse. Also, no evidence was presented suggesting that Todd was unwilling to provide food, clothing, shelter, or basic necessities for the children or that he failed to communicate and visit with them. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 46; *In re Sean B.*, 170 Ohio App.3d 557, 2007-Ohio-1189, 868 N.E.2d 280, ¶ 41–42; *In re Nicholas Bruce Lee R.*, 6th Dist. No. H–02–053, 2003-Ohio-1414, 2003 WL 1487341, ¶ 33.

{¶ 46} With respect to the R.C. 2151.414(E)(1) finding that Todd failed to remedy the conditions causing his children's removal from the home, the children

were removed from the home due to Joshua's subdural hematoma, not because Todd was a pedophile. LCCS had received prior referrals regarding Todd's sexual-offender status and his convictions beginning in 2001 and were aware that he was living with Sarah and Jonathan. LCCS investigated, found all allegations insubstantial, and found no reason to intervene until Joshua's injury. LCCS's witnesses repeatedly stated that the decision to seek permanent custody was not made because of Joshua's injury and no perpetrator had been identified. The GAL's report indicated that if Joshua's injury were the sole concern, then he "might suggest that reunification was still a possibility." He found Todd's status as a sexual offender the "greater issue." However, Todd's sexual-offender status was not the reason for the children's removal. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 32.

{¶ 47} Nevertheless, the record does support a finding that R.C. 2151.414(E)(2) applies to Todd. In order to find that section applicable, the parent's mental illness must be "so severe that it makes the parent unable to provide an adequate permanent home" at the time of or within one year after the dispositional hearing. The evidence must show that the mental illness affects the parent's ability to care for his or her children. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 33; *In re Amber L.*, 6th Dist. No. WM–05–003, 2005-Ohio-4172, ¶ 12.

{¶ 48} Todd argues that the parent/child relationship cannot be permanently severed unless a parent's condition has a direct, adverse effect on the child or the home environment. His crimes occurred in 1991, no allegations of sexual offenses have been reported to LCCS, and LCCS has not alleged that Todd has abused the children. LCCS counters that the law has never required that demonstrable harm occur before removing a child from a dangerous home environment. In this case, LCCS argues, the risk Todd's pedophilia presents to his children requires removing them from his care.

{¶ 49} Ohio courts have yet to squarely confront the issue of whether a prior sexual-offense conviction can form the sole basis supporting a finding of parental unfitness and a termination of parental rights.[2] LCCS's arguments vacillate between supporting permanent custody because of Todd's sexual-offender status and Todd's multiple diagnoses as a pedophile. While a sexual-offense conviction—standing alone—would most likely not per se demonstrate that a parent is unable to provide an adequate permanent home, we need not confront the issue. Rather, the evidence sufficiently supports a finding that Todd's repeatedly

---

2. Cases we have found addressing the issue include *In re L.M.* (2001), 319 Ill.App.3d 865, 254 Ill.Dec. 400, 747 N.E.2d 440; *State ex rel. State Office for Serv. to Children & Families v. Burke* (1999), 164 Ore.App. 178, 990 P.2d 922; *In re Welfare of H.M.P.W.* (1979), 281 N.W.2d 188.

diagnosed pedophilia—not his 16–year–old conviction—is sufficient to support a finding pursuant to R.C. 2151.414(E)(2).

{¶ 50} Because permanent custody is a drastic measure, judicial response to mental illness—of any sort—"should be the least intrusive that is available." *In re William S.*, 75 Ohio St.3d at 101, 661 N.E.2d 738. While Todd's efforts in sexual-offender therapy are commendable, and his most recent therapist testified that he made significant strides in therapy, the risk his pedophilia presents to children living in his household is high. All the witnesses qualified as experts in sexual-offender treatment testified that pedophilia is a chronic condition. Although a pedophile may be able to refrain from reoffending, the risk is never completely ameliorated. Prolonged exposure to vulnerable children in the household setting increases the risk of reoffending substantially. Emahiser testified that he rarely recommends reunification, although it has been done; great vigilance is required to prevent reoffenses from occurring. A pedophile parent would have to renounce physical contact with children; daily caretaking chores for the children are completely curtailed; and the parent could never be alone in the same room with the child. A home in which a child must be taught never to physically interact with a parent due to the risk of sexual abuse cannot constitute an adequate permanent home.

{¶ 51} Appellant contends that home-based sexual-offender therapy is available and that LCCS could still retain protective supervision after reunification. However, given the testimony regarding Todd's risk of reoffending, intermittent home checks would likely detect harm only after abuse has occurred and would thus insufficiently protect the children. As to Todd's safety plan, the trial court specifically found "shallow empathy" in the plan's creation, and the record supports this determination. Therefore, due to Todd's multiple diagnoses of pedophilia, and the expert testimony regarding his therapy, we conclude that Todd's pedophilia qualifies as a "chronic mental or emotional illness" so severe that his children cannot and should not be placed in his care. Appellants' assignment of error is therefore not well taken with respect to Todd.

{¶ 52} Turning to Sarah, LCCS sought termination of her parental rights because she continued to cohabit with Todd after learning of his condition and she is allegedly unable to protect the children from Todd. The judgment entry stated with respect to Sarah, "[t]he Court has also considered the fact that [appellants] have chosen to remain together as a couple and advocate for return of the children to a home they will maintain together."

{¶ 53} As discussed above, Joshua's injury precipitated the removal of the children from the home, eliminating R.C. 2151.414(E)(1). Sarah was not diagnosed with a chronic mental or emotional illness as required by R.C.

2151.414(E)(2). No evidence was put forth that she has demonstrated a lack of commitment pursuant to R.C. 2151.414(E)(4). Throughout this matter, Sarah worked extensively with LCCS, parenting teachers, therapists, and counselors, visited the children regularly, and remained bonded with them, and all caseworkers agreed that she completed her case plan services successfully.

{¶ 54} Just one statutory factor, R.C. 2151.414(E)(14), applies, because this finding shows that Sarah was unwilling to prevent her children from suffering sexual abuse by continuing to cohabit with a pedophile.

{¶ 55} Notably, no LCCS witness testified that Sarah was told that she would have to maintain a home separate from her husband in order to regain custody of her children. LCCS's case plan did not require Sarah to cease cohabiting with Todd; instead, it required Sarah to participate in sexual-offender therapy, and LCCS sent her to Emahiser. Emahiser tasked Sarah with asking LCCS whether separating from Todd would help her case, and Sarah reported that her caseworker said that "it would not make any difference." Additionally, Emahiser, the LCCS-sanctioned sex-offender therapist, trained Sarah as to how to integrate Todd into their home and told her that home-based, postreunification counseling would be available. He wrote—at the request of LCCS—that Sarah had developed a plan to keep her children safe and she "had demonstrated the ability to identify high risk behaviors in her husband and specific strategies to minimize the risk of her children being harmed." Foreseeably, accomplishing the work that LCCS requested would have raised a reasonable expectation on her part that she had demonstrated her *willingness* to keep the children safe and that the children would be returned.

{¶ 56} The GAL and LCCS witnesses testified that they did not believe that Sarah had the ability to protect the children from Todd's pedophilia by adequately adhering to Todd's relapse-prevention plan. By implication, LCCS would have allowed reunification had they believed Sarah *could* adequately follow a relapse-prevention plan. The statute, however, requires LCCS to show, by clear and convincing evidence, that Sarah was *unwilling* to protect the children from sexual abuse.

{¶ 57} Further, LCCS was made aware that prior to the birth of Kayla and Joshua, a sex offender was living in a household with Sarah's older child. LCCS received referrals regarding Sarah's older child, Jonathan, in December 2001. LCCS's investigative report shows that LCCS was aware that Sarah had married a sex offender and pedophile, and Todd's parole officer warned the caseworker that he was not to be alone with children. The caseworker then told Sarah "to be very careful." The caseworker also talked to a detective who told her that Todd "has every legal right to be in the home with" Jonathan. The caseworker closed the investigation as "unsubstantiated," concluding that Jonathan was "at low to

moderate risk of abuse and neglect." After Kayla's birth, in April 2004, LCCS received another referral, of concern that a sex offender was living with children; the caseworker noted the prior, unsubstantiated referrals, noted that Sarah was aware of Todd's past, and noted the absence of a court order "saying he cannot be in the home." Less than a year later, Todd and Sarah brought three-month-old Joshua to the hospital. If the risk of *sexual* abuse presented by cohabiting with a known pedophile was so large that termination of Sarah's parental rights— the "last resort"—was required, then Joshua's injury would have been unnecessary to precipitate the custody process. This evidence also casts doubt on a conclusion that cohabiting with Todd, alone, renders Sarah unwilling to protect her children from sexual abuse.

{¶ 58} Even as LCCS argued that physical separation was necessary to protect the children from Todd's pedophilia, LCCS provided Sarah with a sex-offender therapist who gave Sarah hope that reunification of her entire family was possible. It seems manifestly unfair to seek termination of Sarah's parental rights for "advocating for the return of the children to a home" with Todd present, that is, failing to establish a separate household, without providing her a clear notice and opportunity to do what was only implicitly required.

{¶ 59} However, it should also have been apparent that ceasing to cohabit with Todd was necessary. The testimony and evidence before the trial court showed that the risk of sexual abuse Todd presented to the children while cohabiting with them was high. Any person would find it practically impossible to follow the reunification plan—to parent two young children while ensuring that another adult in the household was never alone with them. Appellants gamely argue that any risk of harm to the children was speculative, as Todd had not reoffended in 16 years; the children, including Sarah's oldest son, denied that sexual abuse had occurred; and a relapse-prevention plan and home-based, postreunification services were available. Sarah's refusal to take the step of establishing a separate physical household from Todd demonstrates a lack of appreciation of the risk of sexual abuse Todd presents while cohabiting with her children. Because Sarah did not voluntarily choose to cease cohabiting with Todd, clear and convincing evidence supports a finding that she is unwilling to prevent the risk of sexual abuse to her children pursuant to R.C. 2151.414(E)(14).

{¶ 60} Since we uphold the findings of parental unfitness pursuant to R.C. 2151.414(E)(2) with respect to Todd and R.C. 2151.414(E)(14) with respect to Sarah, we proceed to review whether terminating their parental rights is in Kayla's and Joshua's best interests. A court is required to consider all relevant favors, including, but not limited to, the factors enumerated in R.C. 2151.414(D) and 2151.414(E)(7) through (11). In its judgment entry, the trial court stated (1) that the children were in need of a legally secure permanent placement and that

awarding LCCS permanent custody would facilitate adoption and (2) that the GAL's final report recommended permanent custody as being in the children's best interest.

{¶ 61} These considerations are sufficient to enter a determination that termination of appellants' parental rights is in the children's best interests. The two considerations stated by the trial court mirror the considerations of R.C. 2151.414(D)(4) and (2), respectively. Because the "best interests" list of considerations is not exhaustive, nor must each consideration be separately articulated in the judgment entry, we cannot say the trial court erred in its determination. *In re Nicholas A.,* 6th Dist. No. L–04–1303, 2005-Ohio-2104, 2005 WL 1009892, ¶ 23; *In re Erich L.,* 6th Dist. No. L–04–1340, 2005-Ohio-2945, 2005 WL 1389086, ¶ 42; *In re Turner,* 5th Dist. No. 2006–CA–45, 2006-Ohio-6793, 2006 WL 3746054, ¶ 34; *In re Hershberger & Smith,* 3d Dist. Nos. 1–04–55 and 1–04–61, 2005-Ohio-429, 2005 WL 280356; *In re G.B.,* 10th Dist. No. 04AP–1024, 2005-Ohio-3141, 2005 WL 1476884. But see, contra, *In re Smith,* 11th Dist. No. 2002–A–0098, 2003-Ohio-800, 2003 WL 470198 (failure to separately discuss and make findings for each factor of R.C. 2151.414(D) when determining a child's best interests is prejudicial error).

{¶ 62} For the foregoing reasons, appellants' assignment of error is not well taken. The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.

Judgment affirmed.

OSOWIK, J., concurs.

HANDWORK, J., concurs in judgment only.