[Cite as *In re R.C.*, 2010-Ohio-3800.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN THE MATTER OF:                                    CASE NO. 16-09-11

   R.C.,

ADJUDICATED DEPENDENT CHILD,                O P I N I O N

[STACY CRISP, MOTHER-APPELLANT]
[TRAVIS CRISP, FATHER-APPELLANT].

IN THE MATTER OF:                                    CASE NO. 16-09-12

   A.C.,

ADJUDICATED DEPENDENT CHILD,                O P I N I O N

[STACY CRISP, MOTHER-APPELLANT]
[TRAVIS CRISP, FATHER-APPELLANT].

IN THE MATTER OF:                                    CASE NO. 16-09-13

   T.C.,

ADJUDICATED DEPENDENT CHILD,                O P I N I O N

[STACY CRISP, MOTHER-APPELLANT]
[TRAVIS CRISP, FATHER-APPELLANT]

Case No. 16-09-11, 12, 13

**Appeal from Wyandot County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. C2082005, C2082006, C2082007**

**Judgments Affirmed**

**Date of Decision:  August 16, 2010**

**APPEARANCES:**

*Randy Hoffman* **for Appellant Travis Crisp**

*Howard Elliott* **for Appellant Stacy Crisp**

*Douglas Rowland* **for Appellee**

**SHAW, J.**

{¶1}  Appellants Travis Crisp ("Travis") and Stacy Crisp ("Stacy") bring this appeal from the judgments of the Court of Common Pleas of Wyandot County, Juvenile Division, terminating their parental rights and granting permanent custody to the Wyandot County Department of Job and Family Services ("the Agency").  For the reasons set forth below, the judgments are affirmed.

{¶2}  On February 20, 2008, the Agency filed complaints alleging that RC (born 2001), AC (born 2002) and TC (born 2006) were dependent and neglected children.  The complaints were based upon the fact that Travis and Stacy were not providing the necessities of food, appropriate shelter, and water, for the children.  The complaints asked for protective supervision of the children.  On March 3, 2008, a hearing was held on the complaints.  The Agency also moved to amend the complaints to request temporary custody due to the fact that the housing situation had become dire due to lack of heat and running water in the home.  In addition, the Agency's investigator testified that Travis and Stacy were at high risk of having their electric service terminated and being evicted from the home.  The caseworker testified that she had been to the home the Friday before the hearing and found the family using an electric heater because they had no more kerosene, there was no drinking water, the water pipes were frozen, the toilet was no longer functioning, there was little food in the house, and that the family had been informed that the electricity would be shut off at the end of the day.  In addition, the children were in need of medical attention.  The trial court granted temporary emergency custody to the Agency, and set the matter for an adjudication hearing on the amended complaints.  The adjudicatory hearing was held on March 24, 2008.  Travis and Stacy consented to a finding of dependency and the neglect

charge was dismissed. The parties also agreed to a continuation of temporary custody as the appropriate disposition. Thus, temporary custody was continued.

{¶3} On April 2, 2008, the Agency filed a case plan which required Travis and Stacy to complete four objectives: 1) obtain employment and achieve financial stability; 2) attend counseling to learn to communicate with each other in a civil manner and without violence; 3) attend parenting classes to learn how to communicate properly with their children; and 4) complete a substance abuse assessment and follow the recommendations of the counselor. On May 23, 2008, the case plan was amended to move the placement from a foster family to a "certified approved nonrelative" family identified by Travis and Stacy as an appropriate placement. A semi-annual review of the case plan was filed on August 18, 2008. The review indicated no progress on the case plan. Travis and Stacy had no housing, no jobs, continued to fight, missed visits, missed assessments, failed to attend budgeting and parenting classes, refused to meet with the therapist, and failed to maintain consistent contact with the Agency. The Agency recommended continuing temporary custody.

{¶4} On February 10, 2009, a second semi-annual review was filed. At this time, the Agency noted that Travis and Stacy had begun to show "some progress" on the case plan. Travis and Stacy were still unemployed and living off Stacy's disability as well as assistance from the Agency. However, they had

maintained an apartment for a couple months. The Agency was concerned that the marital relationship was still volatile with Stacy continually switching between wanting a divorce and wanting only counseling. The Agency was also concerned that Stacy was making allegations that Travis was abusive and Travis was making allegations that Stacy was addicted to pain killers. The Agency modified the case plan to require Travis and Stacy to have a psychological assessment and set up the appointment for the assessment. On February 11, 2009, the Agency moved for a six month extension of temporary custody. A hearing was held on the motion on February 17, 2009, and the trial court granted the motion on February 24, 2009.

{¶5} On May 19, 2009, the Agency filed a motion for permanent custody. The Agency alleged that the children had been in the custody of the Agency for more than twelve of the last twenty-two months and that the children could not be placed with either parent within a reasonable time. A third semi-annual review was filed with the court on August 5, 2009. The review indicated that Travis and Stacy had made insufficient progress. At that time, the parenting classes were not completed, counseling sessions had been cancelled due to lack of appearance by Travis and Stacy, they had no stable relationship, no home, and no employment. In addition, Travis and Stacy had not completed their substance abuse assessment. On August 7, 2009, the Guardian Ad Litem ("GAL") filed her report indicating

that the children wanted to continue contact with their parents, but wished to live with their placement family.

**{¶6}** The hearing on the motion for permanent custody was held on August 10-11, 2009. Mel Proctor, the clinical counselor, testified that the Agency referred Travis and Stacy to him for marital and parenting counseling on two separate occasions. The first group of counseling ended on May 29, 2008, after Travis and Stacy failed to appear for numerous sessions. (Aug. 10, 2009, Tr. 22.) The second referral was made on December 11, 2008. (id.) The initial assessment of Travis and Stacy occurred on two separate occasions with a third set to discuss treatment planning. (id. at p. 12.) Proctor identified their relationship as being a hostile dependent relationship with anger and jealousy issues. (id. at p. 14.) He diagnosed Stacy with post traumatic stress disorder and a depressive mental illness, which could be treated if Stacy wanted to work on the issues. (id. at p. 16.) He testified that they were scheduled for a psychological evaluation on February 11, 2009, but failed to appear for the appointment. After that, Travis and Stacy failed to respond to calls or initiate contact for any further sessions and he referred the case back to the Agency. (id. at p. 16.)

**{¶7}** Sue Cunningham, the outpatient mental health coordinator for Firelands, testified that both Travis and Stacy were scheduled for a substance abuse assessment and psychological testing on February 10, 2009. (id. at p. 34.)

They did not appear.  (id. at p. 35.)  The appointment was then rescheduled for March 3, 2009, at the request of Travis and Stacy.  (id.)  They did not appear for that appointment either.  (id.)

{¶8}  Dr. David Canell,[1] a clinical psychologist, testified that he was contacted by the Agency to provide psychological testing of Travis and Stacy. The first appointment was scheduled for March 3, 2009, but they did not appear. (id. at p. 42.)  The testing was rescheduled for March 18, 2009 and they did attend. (id. at p. 40.)  At that meeting, he was able to complete part of the assessment and a follow up appointment to conclude the testing was scheduled for April 8, 2009. (id. at pp. 43, 49.)  However, Travis and Stacy did not appear at the second appointment and the assessment was not completed.  (id. at p. 49.)  On May 11, 2009, Dr. Canell completed his evaluation based upon the tests that had been completed.  Travis' test results were valid and revealed no pathology.  (id. at 52.) The tests did reveal that Travis may be suffering from mild depression, anxiety, anger, and various other social issues.  (id.)  As to Stacy, Dr. Canell was concerned with Stacy's extensive medical history in which she was prescribed pain killers.  (id. at p. 47.)  Her test results were deemed invalid due to Stacy's lack of motivation and low IQ.  (id. at p. 51.)

---

[1] The Agency's brief indicates that the transcript incorrectly spelled Dr. Canell's name and that the proper spelling is "Connell."  However, we elect to utilize the spelling of the doctor's name as it appears in the transcript.

{¶9} Don Spiegel, Travis and Stacy's former landlord, testified that he rented an apartment to the couple from November 2008, to April 2009. (August 11, 2009, Tr. 8.) He testified that the Agency paid the security deposit and the first two months rent. (id.) Travis and Stacy did pay the rent for January and February. (id. at p. 9.) However, they did not pay the rent for March. (id.) After they failed to pay April's rent, they were asked to leave, and they moved that weekend. (id. at p. 10.) When they moved, they left behind bags of children's clothes, toys, dishes, furniture, and appliances. (id. at p. 11.)

{¶10} April Allison, the caseworker, testified that since the Agency had been granted temporary custody, the parents had failed to make progress on the case plan. The case plan required Travis and Stacy to obtain housing and financial stability. However, Stacy had nineteen changes of address during the case and Travis had twelve changes of address. (id. at pp. 19-20.) The Agency attempted to assist them by providing gas cards so they could seek employment and housing, by finding them housing and assisting with the rent, by paying past utility bills so that Travis and Stacy could again have utilities, and by providing furniture and appliances. (id. at pp. 22-23.) Allison also testified that she explained how to budget and what was needed to obtain assistance to Travis and Stacy, but they did not act on the information. (id. at p. 27.) She stated that Travis needed to attend two weeks of GED classes in order to qualify for food stamps for the family, but

did not do so. (id.) Travis was offered a work program, but did not participate. (id. at p. 28.) Travis also offered no evidence that he had any interviews or that he was even seeking work. (id.) Stacy was also supposed to either obtain employment or provide a reason why she could not work in any capacity. Stacy claimed that she was working as a housekeeper in a local motel, but never provided any proof of this employment when asked. Instead, she simply continued to request gas cards so that she could go to work.

{¶11} Allison also testified that Travis and Stacy never utilized the counseling services offered to help them with their marital issues or their parenting issues. (id. at p. 29.) Stacy was frequently stating that she wanted a divorce and that the marriage was over. (id.) Then she would tell Allison that she and Travis were back together and she was not leaving. (id. at p. 32.) Allison testified that this constant back and forth does not provide the stability the children need. (id.) Additionally, Travis and Stacy did not complete the parenting classes. (id. at p. 33.) Their visits with the children, while consistent at the beginning, became less so over time. (id. at p. 36.) Neither Travis nor Stacy appeared for visits in April or May of 2009. (id. at p. 37.) Allison testified that Travis and Stacy's progress on the goals of the case plan was "very, very minimal." (id. at p. 42.) The recent attempts at home visits were worthless because the address given by Stacy was not her real address. (id. at p. 49.) Stacy was instead living in various motels with her

boyfriend or in her car. (id.) Travis' address was current, but when Allison went for the visit she was basically told to leave without being let into the home. (id. at p. 50.)

{¶12} Kristie Swartz, the case aide, testified that there was a bond between the boys and their parents. (id. at pp. 74-75.) However, the visits were not consistent and the boys were upset when the visits were missed. (id. at pp. 73, 80.) Swartz also testified that the Agency had provided a total of $4,594.03 in financial assistance to Travis and Stacy while the boys were in the temporary custody of the Agency. (id. at p. 78.) This assistance did not result in any improvement in their circumstances. (id.)

{¶13} Louanne Hufford, the GAL, testified that the boys were doing well in their current placement. (id. at p. 109.) She testified that RC and AC told her they would like to continue living with their foster family, but still have some contact with their parents. (id. at pp. 112, 117.) TC was too young to give his opinion. (id. at p. 117.) In her opinion, Travis and Stacy had made almost no effort to complete the case plan and actually appeared to have regressed rather than progressed. (id. at pp. 115-116.) Hufford concluded that the children's best interests would be served by granting the Agency permanent custody, but maintaining some contact with Travis and Stacy.

{¶14} At the conclusion of the hearing, the trial court announced its decision granting permanent custody to the Agency. The judgment entries granting permanent custody to the Agency were filed on August 26, 2009. Travis appeals from these judgments and raises the following assignments of error.

**Travis' First Assignment of Error**

**The trial court erred in granting permanent custody of the minor children to [the Agency] because the plan implemented by the Agency was not reasonably calculated to succeed in reunification with their father, Travis Crisp.**

**Travis' Second Assignment of Error**

**The trial court erred in terminating [Travis'] parental rights and granting permanent custody to [the Agency] where that decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence.**

Stacy also appeals from the judgment entries and raises the following assignments of error.

**Stacy's First Assignment of Error**

**The trial court erred in granting permanent custody of the minor children to [the Agency] because the plan implemented by the agency was not reasonable to promote reunification with [Stacy].**

**Stacy's Second Assignment of Error**

**The trial court abused its discretion in refusing to grant a request for a continuance at the request of [Stacy] who had been in the hospital emergency room the prior night and was in pain and prescribed medication on the hearing date of August 10,**

**2009, which materially impaired her ability to assist counsel in her defense of the permanent custody motion.**

*Travis' and Stacy's First Assignments of Error*

{¶15} In Travis' first assignment of error and Stacy's first assignment of error, they both allege that the case plan was not designed to succeed in the goal of reunification. More specifically, Travis and Stacy both claim that the case plan was not designed to provide for reunification because it did not address the parents separately.

{¶16} The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; see, also, *In re Brown* (1994), 98 Ohio App.3d 337, 344, 648 N.E.2d 576. Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3rd Dist. No. 1-01-75, 2001-Ohio-2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.* Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the Agency] could have done, but whether the [Agency's] case planning and efforts were reasonable and

diligent under the circumstances of this case." *In re Leveck*, 3rd Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, at ¶ 10.

{¶17} Here, the children were removed from the home because neither of their parents was providing the basic necessities of life, such as food, shelter, and running water. Travis and Stacy were on the verge of being evicted. The only heat in the home was a small electric space heater and the electricity was about to be shut off. The pipes were frozen, which prevented them from having fresh water or being able to use the toilet. There was also very little food in the home. These circumstances occurred because Travis and Stacy were both unemployed and had exhausted community support options. Their only income was from Stacy's disability check. The case plan, while requiring both Travis and Stacy to work on their communication skills, did require several things either parent could have completed without the other's cooperation. Travis needed to complete parenting classes with Proctor, to complete a substance abuse assessment and a psychological assessment, to obtain and retain employment, to complete two weeks of GED classes in order to be eligible for food stamps, to obtain stable housing, and to visit with his children. Stacy also needed to complete the parenting classes with Proctor, complete a substance abuse assessment and a psychological assessment, obtain and retain employment or provide a medical excuse why this was not possible, obtain stable housing, and visit with the

children. Although many of these objectives could have been completed as a couple, there was no requirement that this had to occur. These requirements, if met, would have allowed the children to be placed with either or both of their parents.

{¶18} Travis only met with Proctor a few times and appeared for the first half of the psychological assessment. He also missed several visits. Stacy also only met with Proctor a few times and appeared for the first half of the psychological assessment. The testing she did complete was deemed invalid. Additionally, there were concerns raised concerning a possible substance abuse problem with Stacy due to her many trips to emergency rooms for pain killers and statements made by Travis that Stacy was addicted to the pain killers. She also missed several visits. Moreover, neither parent was able to obtain and retain employment nor was either parent able to obtain and retain stable housing. Although they were given substantial financial assistance in locating and obtaining an apartment, they only paid two months rent from Stacy's disability income before they stopped paying and were ordered to vacate the apartment. Neither parent completed budgeting training, which would have helped them learn to manage the small income they had.

{¶19} Basically, after more than a year of assistance by the Agency, the parties were in the same situation or a worse situation than that which caused the

removal of the children in the first place. Thus, the trial court did not err in finding that the Agency had made a reasonable case plan and diligent efforts to return the children to either of their parents. Both Travis' first assignment of error and Stacy's first assignment of error are overruled.

*Stacy's Second Assignment of Error*

{¶20} Stacy's second assignment of error alleges that the trial court erred by not granting her continuance. The decision whether to grant a continuance is within the sound discretion of the trial court. *In re T.C.*, 140 Ohio App.3d 409, 747 N.E.2d 881, 2000-Ohio-1769. To determine whether the trial court has abused its discretion, the appellate court must apply a balancing test considering all competing interests. *Id.*

> **In evaluating a motion for a continuance, a court should note inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.**

*Id.* at 417, quoting *State v. Unger* (1981), 67 Ohio St.2d 65, 67-68, 423 N.E.2d 1078.

{¶21} Here, the following discussion occurred at the hearing.

> **Mr. Hall: Your Honor, I'd like to make one pretrial motion if I could. Uhm, I have here – I will mark it as Mother's 1, brief**

**exhibit. My client went to the Wood County emergency room last night 'cause she's passing kidney stones. She has reported to me that she is in such excruciating pain, that she is not able to, uhm, move forward today.**

**She is not on any type of pain medication. If I, may I approach, Your Honor? She is not on any type of pain medication. She's reporting to me if she's – if she has to go forward she believes that she'll have to leave. It is not meant as any disrespect to the Court, it's just she is, uhm, just not able to physically – to continue today. She wanted to be here to ask for the continuance and to provide me with the medical information that she did go to the hospital.**

**Uhm, so at this point in time we would ask for a continuance of these matters. We understand that there's a number of people here, there's a number of people subpoenaed for this matter, and these matters have been pending for quite some time.**

**But, uhm, you know, the – the – the, uhm, code and the contention for the matters for continuance are generally left within the discretion of the Court, and as the Supreme Court dicta several cases has put a, uhm, permanent custody as being the death penalty of domestic – I'm sorry – of juvenile relationships. And this is a permanent termination of my client's rights involving her children. We – My client would want to be at her best when she attempts to, uhm, address these permanent custody motions. So at this point in time we would ask for a continuance. Thank you.**

**The Court: Thank you. I see where she was prescribed Flomax.**

**Mr. Hall: That's correct, Your Honor. She has not, uh, according to what she's told me – according to what she's told me, she has not had an opportunity as of yet to get this medication filled. Uhm, and again the question I don't know if they're narcotics for pain.**

**Mrs. Crisp: They're supposed to help the stone get through.**

**Mr. Hall:** She describes it to me as "helping the stone get through," Your Honor. I – I – Of all the things in the world I have, a medical degree is not one of them. So I don't know.

**The Court:** She hasn't taken this yet?

**Mr. Hall:** She has not taken any medication as of yet, Your Honor. She's – she's concerned about the – the outcome of her ability to think clearly during this – this proceeding if she was to take medication. So I – She's, you know, caught in the old catch 22. If she's – she's unable to be here because of the pain, but if she takes something for the pain she may not be –

**The Court:** Mr. Hall, I understand your arguments and I wanna kind of get on with it. All right?

**Mr. Hall:** Yes, ma'am.

**The Court:** Regardless of what I do.

**Mr. Hall:** Yes.

**The Court:** Mr. Ruhlen, how do you feel about that?

**Mr. Ruhlen:** Your Honor, my client and I, we have no objection to the continuance given the circumstances.

**The Court:** Mr. Johnson?

**Mr. Johnson:** Your Honor, I have no specific objection; however, I do (Inaudible) notice in the – in the paperwork, uh, an order to return in one day, and I guess that would be today, to see a doctor. I don't know how that would be accomplished (Inaudible).

**The Court:** Mr. Rowland?

**Mr. Rowland:** My concern is I know we have several witnesses subpoenaed to appear here today. I – I do understand the gravity of the type of hearing that we're gonna have today, and

**quite frankly, I'd like to go forward. But at the same time I don't want to be visiting this issue on appeal if this should happen in the future, if that should happen under the circumstance.**

**I would ask that the Court maybe – or the parties agree to do something to do something to call Wood County and verify that she was in the hospital last night, uhm, and some of the circumstances.**

**The Court: The, uhm, prescription is dated 8-9-09 at 11:38. Is that a.m. or p.m.?**

**Mrs. Crisp: I got there around, uhm, around 12 at midnight. He was dropping off, uhm, his sister.**

**The Court: And the only medication they gave you was for Flomax? Nothing for the pain?**

**Mrs. Crisp: They said that was for the pain. They gave me another prescription, but I mean I just ripped that one off for now to give that one to you.**

**The Court: Mr. Rowland, do you have any witnesses here that would be difficult to get back here tomorrow?**

**Mr. Rowland: Your Honor, I do have one witness that's supposed to be in training today. Uhm, and –**

**The Court: Who is it?**

**Mr. Rowland: Mr. Proctor. Mel Proctor is supposed to be in training today; he's not attending his training for purposes of this hearing. I would like to –**

**The Court: Why – Let's – let's move forward with that witness and then we'll see where we're at. All right?**

**\* \* \***

**The Court:**  Uhm, in looking at this information you gave from Wood County Hospital, they note that the type of problem your client is experiencing involves intermittent pain.  It doesn't appear that it's continual.

**Mr. Hall:**  It's continual on her part, Your Honor.  She – she's just indicated to me that it's – it's just as bad as it was when she got here this morning and we would renew our –

**The Court:**  For the record, I would note when I look over your client does look pained; however, when I look at other times she looks calm and interested in what people are saying.  So I'm not saying she doesn't have it, but I – I don't think that it's – physically she does appear that it distresses her continually.  However, I am going to give you the continuance at this point unless, Mr. Rowland, you have a witness that you will not be able to easily call tomorrow.

**Mr. Rowland:**  Your Honor, I have two and if we could – I believe both of them will be very short.  One's from Fireland's and I believe will be very short, and then Doctor Canell.  If we could get those two professional out, they're difficult to schedule and it's hard to get them here.

**The Court:**  All right.

**Mr. Rowland:**  Uhm, I do believe that they'll be brief.

**Mr. Hall:**  Would a five minute break help?

**Mrs. Crisp:**  It ain't gonna help it (Inaudible).

**The Court:**  If your client, Mr. Hall, needs a break, we'll take the break.

**Mr. Hall:**  I'm gonna need a five-minute break, Your Honor, and then –

**The Court:**  You're gonna need a five-minute break?

**Mr. Hall:  If I could, Your Honor.  I'd like to talk to my client.**

**The Court:  All right.**

**(Recess was taken).**

**The Court:  Back on record.  Mr. Hall, what's your client's other prescription for?**

**Mr. Hall:  Darvocets, Your Honor.**

**The Court:  Do you have the prescription for that?**

**Mr. Hall:  Yes, Your Honor.**

**\* \* \***

**The Court:  All right.  Thank you.  I'm doing a balancing act here, because I'm trying not to be insensitive to your client; however, I talked to court personnel who saw her sitting out in the hallway and looked fine, sitting up straight.  When she came through the metal detector came through fine, was responsive.  Uhm, I – you know, I can't say she doesn't have that.  But I can say when I look over I see pain looks, but when I look over other times, I – I see somebody who looks perfectly normal.**

**Uhm, trying to balance these interests – and the other thing that really confuses me is I checked out what Flomax does and that can help relieve this.**

**If you're in so much pain, why wouldn't you get the prescription filled that could help you?**

**Mrs. Crisp:  Your Honor, the pharmacy – I got it last night but by the time I got home the pharmacies were all closed and I had to come straight to court.  The pharmacy don't open until 9 o'clock here.**

**The Court:  You were in Bowling Green at the hospital, right?**

**Mrs. Crisp:  Yes.**

**The Court:  Why didn't you go here?**

**Mrs. Crisp:  There's no pharmacy there, Your Honor.**

**The Court:  Where?**

**Mrs. Crisp:  There's no pharmacy that was open at 24 hours.**

**The Court:  Where?**

**Mrs. Crisp:  In Bowling Green and there's no pharmacy open 24 hours here.**

**The Court:  Isn't – isn't Meijer's open 24 hours?**

**Mrs. Crisp:  No, Your Honor.  There's only one pharmacy and that's clear in, uhm, Allen County.**

**The Court:  How about in Findlay?**

**Mrs. Crisp:  No.**

**The Court:  No pharmacy's open 24 hours?**

**Mrs. Crisp:  No pharmacy's open.  There's only one pharmacy open.**

**The Court:  Where are you currently living?**

**Mrs. Crisp:  Right now I'm back and forth from the hotels and his place right now.**

**The Court:  Where are those places?**

**Mrs. Crisp:  Uhm, Kenton hotel.  I bounce to Upper hotel and his dad's house at 507 East Street, McGuffey.**

**The Court:  So where – where were you living yesterday?**

**Mrs. Crisp:  Yesterday I was with him.  I was staying in Upper Sandusky hotel.  His sister was, uhm, staying with us.  We took her to Toledo.  On the way back that's when it hit me in the side.**

**The Court:  And you didn't think about going back to Toledo?**

**Mrs. Crisp:  No, I didn't go back to Toledo because he – her boyfriend was bringing her back.  So we were coming back to go back to the hotel so we could get some sleep for court in the morning.  But that's when we were going on I-75 and my side starting (sic) hurting and I told him I ain't gonna make it much longer.  So that's when he took me to the ER.**

**The Court:  All right.  Based on my observations, other court personnel, based on your concerns with those two witnesses this is what we're gonna do.  We're gonna get through those two witness. (sic)  If your client needs a break during any of it, I don't care how many she needs, we'll take it.  And then we're gonna close her down and come back tomorrow.**

**\* \* \***

**The Court:  Well, I will stand true to my word and we will now break.  However, I want to note for the record that, uhm, during one bout where Ms. Crisp's expression was one of pain, she yawned during it, which was curious.  And I also want the record to reflect that I did note your client was able to write you some notes, Mr. Hall, and speak to you while the person was testifying, so it indicated to me she was able to assist you.  And so I did want that noted for the record.**

(Aug. 10, 2009, Tr. 5-9, 27-32, 68-69.)

{¶22} The record in this case clearly indicates that the trial court did balance the competing considerations of the parties.  The trial court then determined that with an unlimited number of breaks, the proceedings could

-22-

continue for a limited time to get through the witnesses that would be difficult to reschedule. The record also indicates that the proceedings concluded before 11:00 a.m. and that the continuance was then granted to allow Stacy time to recover. Additionally, the trial court noted that Stacy had participated in her defense by passing notes to her attorney and speaking with him during the testimony. This court notes that Stacy does not point to any prejudice that she suffered in the delay of the grant of the continuance. For these reasons, Stacy's second assignment of error is overruled.

*Travis' Second Assignment of Error*

{¶23} In his second assignment of error, Travis alleges that the trial court's decision to grant permanent custody of the children to the Agency was against the manifest weight of the evidence. As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

{¶24} Revised Code section 2151.414(B)(1) states that the trial court

**may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply: * * * (d) The child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period[.]**

For the purposes of R.C. 2151.414(B)(1)(d), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty (60) days after the removal of the child from the home." R.C. 2151.414(B)(1)(d).

{¶25} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.*, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court

will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613. Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.

{¶26} Here, the trial court found that that the children were in the temporary custody of the Agency for twelve of the prior twenty-two consecutive months pursuant to R.C. 2151.414(B)(1)(d). As previously noted, the children were adjudicated dependent on March 24, 2008. The motion for permanent custody was not filed until May 19, 2009. Thus, the trial court's determination in this regard was clearly supported by the evidence. Once this finding was made, the trial court needed only to find that termination of the parental rights was in the children's best interests. See *In re C.W.*, 104 Ohio St.3d 163, 818 N.E.2d 1176, 2004-Ohio-6411, at ¶ 21.

{¶27} In order to determine whether granting permanent custody to an agency is in a child's best interest, the trial court must consider all relevant factors, including, but not limited to, five enumerated factors. R.C. 2151.414(D). Further, "the trial court must either specifically address each of the required considerations set forth in R.C. 2151.414(D) in its judgment entry, or otherwise

provide some affirmative indication in the record that the court has considered the specific factors listed in R.C. 2151.414(D)." *In re D.H.*, 3rd Dist. No. 9-06-57, 2007-Ohio-1762, at ¶ 21. These enumerated factors are

> **(1) The interaction and interrelationship of the child with the child's parent, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**
>
> **(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**
>
> **(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶28} At the conclusion of the presentation of evidence at the permanent custody hearing, the trial court took a recess to consider the case. Upon returning to the record, the trial court announced its decisions. The court provided numerous factual findings and stated that it found by clear and convincing evidence that the best interests of the children were that they be placed in the permanent custody of the Agency. The attorney for the Agency then asked the court for a clarification, specifically asking whether the court's findings

> **were after considering Revised Code Section 2151.414, uhm, including the interaction or relationship of the child with the child's parents, the wishes of the children as expressed through themselves or the Guardian Ad Litem, uhm, the custodial history of the children, and the children's need for a legally secure permanent placement, as well as those factors set forth in E 7 through 11 of 2151.141 [*sic*].[2]**

(August 11, 2009, Tr. 147-148.) The court then informed the prosecutor that he was correct, stated that it considered the factors in R.C. 2151.414, proceeded to provide some additional findings, and once again found that it was "in the best interest of the children, by clear and convincing evidence that, uhm, permanent custody be granted to the Department." (id. at p. 149.) Thereafter, the trial court filed its judgment entries granting permanent custody of the children to the Agency. In these entries, the court made the following findings, which consisted largely of the court's stated findings at the hearing:

> **The Court has considered the factors set forth in Section 2151.414 of the Ohio Revised Code and finds that said child[ren] [have] been in the temporary custody of [the Agency] for at least twelve consecutive months out of the past twenty-two consecutive months with a total of 16 ½ months in the custody of the [Agency]. The [Agency] has been involved with the family since 2001.**
>
> **The Court noted that the parents showed no significant work on the case plan goals. Obviously the children could not be placed with either parent within a reasonable amount of time and given the testimony regarding the lack of enthusiasm dealing with the**

---

[2] The transcript of the hearing reads R.C. 2151.141. However, this section involves a request for copies of records and has nothing to do with permanent custody motions or best interests factors. Thus, it appears that either this is a typographical error or that the prosecutor misspoke, given the preceding recitation of the factors enumerated in R.C. 2151.414.

**marital discord, the parenting issues, the substance abuse and instability issues, it would not be in the children's best interest to be returned to their parents.**

**The Court took into account the children stated their desire regarding their residence as stated by the [GAL]. Diligent efforts by the [Agency] to assist the parents in remedying the problems were unsuccessful even after the [Agency] gave it quite a long period of time to try and help them out. There are concerns about chemical dependency, mental illness possibly, and disabilities that may have made it beyond the parents' ability to provide the children with a suitable stable home. The parents, for whatever reasons have demonstrated a definite lack of commitment by their long period of failing to visit and their failure to follow through with the referrals that were made.**

**The Court finds that the [Agency] has made reasonable efforts toward reunifying said child[ren] with [their] parents but was unsuccessful in returning the child[ren] to [their] home. The Court noted that case plans were developed with four specific goals and the parents have done little to nothing to work on each of those goals.**

**The mother has moved nineteen times and the father has moved twelve times. The difference is because of their marital discord characterized by domestic violence, arguments, frequent break ups and failure to address their relationship issues. * * * Testimony was further developed that the parents went sixty plus days without any visitation with their children despite it being available to them.**

**There appears to be no stability in their residence or in their relationship. Despite the [Agency] providing parents with rent, security deposits, utilities, household goods and furnishings, they could not keep a roof over their own heads even with over $4,000.00 in assistance. Not to mention the instability that would occur to a child who would be forced to move from school district to school district with such instability in residence.**

**Father needed to work two weeks to get their food stamps reinstated and didn't do it, so how would they feed the kids? There is no house, there's no food and the kids' basic physical needs couldn't be fulfilled by their parents.**

**The chaos in the marital relationship creates emotional insecurity. The parents' failure to be consistent with visitation shows an insensitivity towards the children's emotional security and needs.**

**The children have progressed in their current placement. The two oldest children are off medication, doing well in school due to the adults currently in their lives devoting attention to them. It is a better environment that has allowed the children to bloom, to be secure and to be comfortable.**

**The children have been separated from their parents for a long time because their parents were unable or unwilling to do that which was necessary to have the children returned.**

**Undoubtedly these parents love their children, but not enough to work on their own failings or work on their parenting skills, their budget or working to obtain money to provide for their children.**

**If this was just a case of insurmountable poverty, these kids would possibly be returned, but this is a case of lack of desire, enthusiasm and motivation to do that (*sic*) to have the children returned and the kids deserve better.**

Given the evidence previously discussed, we find that the record more than adequately supports the determinations of the trial court. Thus, the trial court did not err in finding that it was in the children's best interest to grant the Agency permanent custody.

{¶29} Nevertheless, the dissent maintains that the trial court erred in terminating the parental rights without first making a finding that granting permanent custody to the Agency was in the children's best interest because the trial court did not state the precise language of R.C. 2151.414(B)(1) that "it is in the best interests of the child to grant permanent custody to the agency" in its judgment entries. Instead, the trial court stated in its judgment entries that "it would be in the children's best interests not to be returned to their parents." The trial court then continued to delineate in the judgment entries the basis for its determination, make other findings in support of the determination, and proceeded to grant permanent custody of the children to the Agency.

{¶30} While we agree with the dissent that the court did not use the precise language of R.C. 2151.414(B)(1) in its entries, the statute does not require the use of these magic words. See *In re K.M.*, 3rd Dist. Nos. 9-09-29, 9-09-30, 2009-Ohio-6719, at ¶ 14, citing *In re Curtis*, 3rd Dist. Nos. 9-99-74, 9-99-75, 9-99-76, 2000-Ohio-1725 (finding that the trial court's failure to use the words "the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents" is not a per se violation of the statutory criteria as long as the judgment entry granting permanent custody supports such conclusion). To the contrary, a determination of best interests *at the hearing* is what the statute mandates. Nevertheless, we note that, although not expressly required by the

statute, the better practice would be for the trial court to enter a finding in its entry that more closely follows the language provided in the statute. However, the absence of the statutory language does not vitiate the trial court's findings in these cases. See *In re R.S.*, 3rd Dist. 9-09-25, 2010-Ohio-2160, at ¶ 23.

**{¶31}** Here, the trial court did make a determination at the hearing, in compliance with and using the precise language of R.C. 2151.414(B)(1), that the best interests of the children were that they be placed in the permanent custody of the Agency, and made this statement not once but twice. Further, the language the trial court used in its entries, in conjunction with its findings and award of permanent custody to the Agency, is the substantial equivalent of, and a clear implementation of, the language used in R.C. 2151.414(B)(1).

**{¶32}** Moreover, when a court grants permanent custody of a child to an agency, R.C. 2151.414(C) requires the trial court to file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding "upon the request of any party[.]" See *In re Curtis*, supra, citing *In re Meyer* (1994), 98 Ohio App.3d 189, 648 N.E.2d 52; quoting R.C. 2151.414(C). Here, no such requests were made to the trial court and neither parent raised this as an issue upon appeal. Rather, Travis only contends that the grants of permanent custody were against the manifest weight of the evidence. Our review of the record indicates that the court considered the relevant criteria and evidence when it granted

permanent custody of the children to the Agency and that the record supported these grants. Therefore, the trial court did not err by awarding permanent custody of the children to the Agency, and Travis' second assignment of error is overruled.

{¶33} For all of these reasons, the judgments of the Court of Common Pleas of Wyandot County, Juvenile Division, are affirmed.

*Judgments Affirmed*

**ROGERS, J., concurs.**

**/jnc**

**WILLAMOWSKI, P.J., dissents.**

{¶34} Although I agree with the majority as to Stacy's assignments of error and Travis' first assignment of error, I would remand the judgment for a new judgment entry. The majority holds that since the statute only requires that the trial court make its findings at the hearing, there is no need for the trial court to repeat the finding that termination of parental rights is in the best interest of the children in the judgment entry, that the hearing is good enough. I disagree.

{¶35} Although the findings made by the trial court are supported by the evidence, the motion for permanent custody cannot be granted without making the required finding that doing so is in the children's best interests. The trial court properly found that the children were in the custody of the Agency for twelve out

of twenty-two consecutive months and included this finding in its judgment entry. After that finding is made, the only other required finding is that termination of parental rights is in the best interest of the children. R.C. 2151.414(B)(1). In making this determination, the trial court must consider the factors set forth in R.C. 2151.414(D). *In re D.H.*, 3d Dist. No. 9-06-57, 2007-Ohio-1762, ¶13. "[It] is not sufficient for the trial court to simply rely on the appellate court to review the factual record or narrative and then make the necessary inferences to determine whether the trial court must have considered each of the required statutory factors." Id. at ¶20. In this case, the trial court failed to include a finding that termination of parental rights is in the best interests of the children in the judgment entry. The purpose of holding the hearing is to determine whether termination of parental rights and granting permanent custody to the Agency is in the best interests of the children.

> **A termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows**.

{¶36} *In re Kayla H.*, 175 Ohio App.3d 192, 2007-Ohio-6128, ¶31, 886 N.E.2d 235 (quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 610 N.E.2d 45). One of those procedural protections is that the trial court makes the necessary findings prior to terminating parental rights. Although that finding was made orally at the hearing, it was not placed in the judgment entry. In Ohio, the well

settled principle of law is that the trial court speaks only through its judgment entry. See *State ex rel. Chapman v. Urschel* (1922), 104 Ohio St. 172, 135 N.E. 630; *Reinbolt v. Reinbolt* (1925), 112 Ohio St. 526, 147 N.E. 808; *State v. Hankins* (1993), 89 Ohio App.3d 567, 626 N.E.2d 965; and *State v. Shepherd*, 3d Dist. No. 6-08-16, 2009-Ohio-3315. The fact that the statute requires that the finding be made at the hearing does not replace the requirement that it be made in the judgment entry. In my opinion, the statute, similar to those for criminal sentencing, merely increases the duty of the trial court and mandates that the finding be made at both the hearing and in the judgment entry.

{¶37} The judgment entry in this case merely specifies that it is not in the best interest of the children to return them to their parents. This is not the same as being in the best interest of the children to terminate parental rights and grant permanent custody to the Agency. Thus, I would sustain Travis' second assignment of error and remand the matter for the trial court to make the statutorily required finding concerning the children's best interests in the judgment entry.