## In re SEAN B. et al.

[Cite as *In re Sean B.*, 170 Ohio App.3d 557, 2007-Ohio-1189.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–06–1034.

Decided March 16, 2007.

558

Dan M. Weiss and Peter M. Field, for appellant.

David T. Rudebock, for appellee.

SINGER, Judge.

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating a mother's parental rights in two of her four adolescent children and granting legal custody of the remaining children to a children services agency for placement in a permanent planned living arrangement. For the reasons that follow, we reverse the judgment and remand the cause for further proceedings.

{¶ 2} Appellant is Connie B., mother of 16–year–old Sean B., 14–year–old Kayla B., 13–year–old Eric P., and 12–year–old Derrick P. Although they are parties in the proceedings below, the children's fathers do not appeal the result. Appellee is the Lucas County Children Services Board.

{¶ 3} Appellee's involvement with this family apparently began in mid–2003, on reports that appellant and Sean's father were employing excessive physical discipline. There are also allusions in the record to a sexual-abuse incident involving Kayla and a friend of the family two years earlier.

{¶ 4} On February 5, 2004, according to appellee's complaint, an 18–year–old male, whom we believe to be the same person later identified as Charles T. or "Uncle Charlie," was in appellant's home "wrestling" with Kayla. Over Kayla's protests, Charlie continued this behavior and indeed began kissing the then 11–year old. Appellee's complaint alleges that appellant was present and directed Charlie to stop, "but she did not see the incident as serious." The complaint continues, alleging that two days later, Charlie was "wrestling" with appellant when Sean mistook this for his mother being in danger. Sean attacked Charlie with a hammer, and Charlie retaliated by choking Sean. The complaint asserts that appellant did not intercede and, again, "minimalized the incident."

{¶ 5} Appellee removed all four children from the home and petitioned the court for an adjudication that they were abused, neglected, and dependent. On March 17, 2004, appellant consented to an adjudication that Sean was abused, neglected, and dependent and that the remaining children were neglected and dependent. Temporary custody went to appellee.

{¶ 6} Following the removal of the children and their placement in foster care, appellee produced an amended case plan that directed appellant to participate in interactive-parenting classes, to be assessed for and engage in treatment for depression and stress, and to submit to random drug screens. At a September 21, 2004 progress hearing, it was reported that appellant had completed her diagnostic assessment, had completed Project Genesis, had completed alcohol and drug assessment, and had produced no positive drug screens.

{¶ 7} On December 21, 2004, appellee moved to return legal custody to appellant while retaining protective services for six months. A January 21, 2005 administrative review reported that appellant had been "complying [with] case plan services." The report notes a recommendation that the children be returned home over a period of time.

{¶ 8} On February 2, 2005, however, appellee dismissed its motion to reunify. On March 25, 2005, appellee moved to terminate appellant's parental rights and award appellee permanent custody of Kayla, Eric, and Derrick. Appellee sought legal custody of Sean for purposes of a planned permanent living arrangement. As it relates to appellant, appellee's motion alleged:

{¶ 9} "The mother has been involved with counseling at Family Services, but does not demonstrate the ability to protect her children even after attending counseling. She was referred to interactive parenting, but failed to successfully complete the program. She has also completed Project Genesis, but still demonstrates the inability to provide a safe environment for her children. The mother continues to allow a sexual predator access to her children. She continues to permit her family members to come over to her house and let them eat all of her food, then her children go without."

{¶ 10} The matter proceeded to a December 2005 hearing on the motion. Prior to the hearing, however, the judge conducted an in-camera interview with the children, all of whom voiced their love for their mother and their desire to be reunited with her.

{¶ 11} At trial, appellee called four present and former therapists for Kayla and the two youngest boys. Each testified that the focus of treatment was issues of "loss and separation" as the result of having been taken away from their mother. Kayla's therapist added that Kayla was very angry "at CSB" for taking her away from her mother. Both of Kayla's therapists testified that it would be "detrimental" and "extremely * * * traumatizing" to Kayla if she was not reunited with her mother. All of the therapists testified that their clients wished to be reunited with their mother.

{¶ 12} Next, appellee called Joyce Ransom, parent educator for the agency. Ransom testified that appellant had completed a 12–week interactive-parenting program, but "not successfully." According to Ransom, appellant failed the course because she failed to exhibit "good judgment." As an example, Ransom reported that at a swimming pool birthday party that appellant organized for the children at a public pool, Uncle Charlie was present. Ransom also recounted an episode when during visitation Sean was seen to be "bench walking"—that is, walking along the top of a park bench—with appellant watching, and appellant said nothing. Sean was 15 years old at the time and there is no evidence that would suggest that this behavior posed an immediate danger to himself or others.

{¶ 13} As another specific example of appellant's lack of "good judgment" and as a basis for a recommendation to terminate parental rights, Ransom refers to a visitation at the East Toledo Family Center when appellant was with her two younger children on the second floor and her two older children were on the first floor of the facility, apparently in violation of visitation protocol. The two older children were 13 and 15 years old. There was no evidence that these teenage children were either misbehaving or could not be located. In fact, Ransom testified that the children followed her up to the second floor visitation area.

{¶ 14} Ransom also opined that parental rights should be terminated because of her conclusion that appellant had "very few positive people" in her life and at family outings, there were "a number of people and [Ransom] had no idea who they were."

{¶ 15} Ransom further testified that her agency will look at "all the people who can provide support to the parents. If—and part of that, the reason that we do that is because without the support of positive people in your life, you can't raise children." With this underlying assumption, Ransom concluded that "Connie had no one in her family and she had no friends that I knew of that was supportive of she and her children."

{¶ 16} Appellee's caseworker for this family testified that the reason the agency sought permanent custody in this matter was appellant's failure to shield the children from "perpetrators." According to a caseworker, when appellant was confronted about the pool incident, she denied guilt and then "shut down," refusing to speak further.

{¶ 17} On cross-examination, the caseworker conceded that appellant had successfully completed "Project Genesis," a course on coping with domestic violence, and that the agency had no concerns about drug or alcohol abuse since appellant had completed "Fresh Attitude." The caseworker also testified that reports from appellant's therapist indicated that she was making good progress. With this, appellee rested.

{¶ 18} After the trial court denied appellant's motion to dismiss, appellant called her individual therapist from Family Services of Northwest Ohio, who testified that it took a while for appellant to deal with the removal of her children from her care. After that, however, the therapist testified that appellant became fully engaged in developing her own assertiveness to set limits and protect the children. In this effort, according to the therapist, appellant had made and continues to make progress and continues to improve.

{¶ 19} The therapist also addressed two areas that had been of concern to appellee's caseworker: appellant's lack of independent housing and her failure to explain herself when confronted with evidence of improper conduct with "perpe-

trators." According to the therapist, appellant requested housing assistance from family services six months before the hearing, but because of personnel changes in that agency, the matter was neglected as appellant was shuffled from one worker to another.

{¶ 20} Concerning appellant's failure to explain herself, the therapist testified that appellant "shut down" as a defense mechanism. According to the therapist, when appellant is confronted by an authoritative figure or a person she believes is powerful, "she becomes overwhelmed and sort of withdraws from it. Just pulls into herself and goes quiet."

{¶ 21} Appellant then testified on her own behalf, reporting that she has rheumatoid arthritis, kidney disease, and lupus, and lives on $579 monthly disability from supplemental Social Security income. Appellant testified that she loves her children and wishes them returned to her.

{¶ 22} Addressing appellee's concerns, appellant testified that there were perhaps 100 people at the pool the day of the party and that she did not know that Uncle Charlie was among them until several days after the event. She also stated that she had already spoken to other members of her family about not disciplining her children and that they had agreed to cooperate. According to appellant, she did not know it was inappropriate to have other family members discipline one's children, because she had grown up in a family in which this was the norm. Appellant testified that although she loves her family, if contact with them is to be an issue, she is prepared to make certain the children are not near them.

{¶ 23} Appellant stated that she recognized that she needed independent housing and had an appointment for housing assistance. She denied any other contact with Uncle Charlie. She also indicated that during Sean's "bench walking," she did respond with a gesture that he get down, and he did. Appellant rested.

{¶ 24} On rebuttal, appellee recalled appellant's caseworker, who testified that Kayla had reported two other contacts with Uncle Charlie: once at a family Christmas gathering and again at a gas station. At the Christmas party, appellant had taken the children and gone when Charlie arrived. At the gas station, however, appellant gave Charlie a ride to a relative's home.

{¶ 25} Prior to the final hearing in this matter, the court-appointed guardian ad litem had recommended that legal custody of Sean and Kayla be awarded to appellee and that appellant's parental rights to Eric and Derrick be terminated and permanent custody go to appellee. Following the trial, however, the guardian ad litem amended her report, recommending that custody of all the children be returned to appellant with protective supervision.

{¶ 26} On January 13, 2006, the court entered a judgment, granting legal custody of Sean and Kayla to appellee, terminating appellant's parental rights to Eric and Derrick, and granting permanent custody to appellee. From this judgment, appellant now brings this appeal. Appellant sets forth a single assignment of error:

{¶ 27} "The trial court erred when it found by clear and convincing evidence that permanent custody of Eric P. and Derrick P. should be awarded to Lucas County Children Services Board and legal custody to Lucas County Children Services for the purposes of a permanent plan living arrangement for Sean B. and Kayla B."

{¶ 28} The parent/child relationship possesses a unique sanctity in our culture and in our law. *In re Stacey S.* (1999), 136 Ohio App.3d 503, 511, 737 N.E.2d 92. A parent's right to raise his or her children has been characterized as an "essential * * * basic civil right." *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. A parent's right to the custody of his or her child has been deemed "paramount." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Perales* (1977), 52 Ohio St.2d 89, 97, 6 O.O.3d 293, 369 N.E.2d 1047. "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 54. Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' Id." Id. at 48, 679 N.E.2d 680.

{¶ 29} The right of a family to remain intact has obtained constitutional protection. *Stanley v. Illinois* at 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Therefore, on review, judicial decisions to terminate parental rights receive careful scrutiny and the permanent removal of a child from his or her family may be condoned "[o]nly where there is demonstrated an incapacity on the part of the parent to provide adequate parental care," not because parental care can be provided by foster parents or adoptive parents. *In re Lay* (1987), 43 Ohio App.3d 78, 82, 539 N.E.2d 664; see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 97, 661 N.E.2d 738; R.C. 2151.01(C).

{¶ 30} Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there first must be a demonstration that the parents are "unfit." *Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511; see, also, *In re Schoeppner* (1976), 46 Ohio St.2d 21, 24, 75 O.O.2d 12, 345 N.E.2d 608.

{¶ 31} When a child is not abandoned or orphaned, the Ohio equivalent of parental unfitness is a statutory determination that he or she "cannot be placed with either parent within a reasonable period of time or should not be placed with

the parents." R.C. 2151.414(E). The statute directs that this threshold conclusion may be entered only if, following a hearing, the court concludes that there is clear and convincing evidence that one of the predicate conditions enumerated in R.C. 2151.414(E)(1) through (16) exists. See *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738, syllabus. Once this finding is properly entered, the court must then determine whether terminating a parent's parental rights is in the child's best interests. R.C. 2151.414(D). Clear and convincing evidence is that evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.*, 6th Dist. No. L–03–1253, 2004-Ohio-896, 2004 WL 368148, ¶ 14; *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

### Unsuitability Factors

{¶ 32} In this matter, the trial court found that appellee had presented proof by clear and convincing evidence that R.C. 2151.414(E)(1), (4), (14), and (16) were satisfied. These statutory provisions provide that the court shall find that a child cannot or should not be placed with his or her parent if:

{¶ 33} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 34} " * * *

{¶ 35} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

{¶ 36} " * * *

{¶ 37} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 38} " * * *

{¶ 39} "(16) Any other factor the court considers relevant."

{¶ 40} R.C. 2151.414(E)(16) is the "catchall" portion of section (E), which permits a finding that the child cannot or should not be reunited with his or her parents for "any other factor." "We have repeatedly held that for a finding under this provision to pass scrutiny, the trial court must ' * * * explain with specificity what the other factor the court deems comparable to one of those enumerated in sections (E)(1) through (15) of R.C. 2151.414.' " *In re Delfino L. M.*, 6th Dist. Nos. L–04–1010 and L–04–1009, 2005-Ohio-320, 2005 WL 195488, ¶ 23, quoting *In re Tashayla S.*, 2004-Ohio-896, 2004 WL 368148, ¶ 24; *In re Alyssa Nicole*, 153 Ohio App.3d 10, 2003-Ohio-2673, 790 N.E.2d 803, ¶ 31; *In re Kaylee*, 6th Dist. No. L–03–1320, 2004-Ohio-2227, 2004 WL 941779, ¶ 18; *In re Crystal C.*, 6th Dist. No. L–01–1336, 2002-Ohio-855, 2002 WL 313337. No such discussion appears in the judgment at issue here.

{¶ 41} The findings under R.C. 2151.414(E)(4) and (14) are simply unsupported by the record. The testimony was unrefuted that appellant regularly visited with her children and that the only reason she had not acquired independent housing was because of the negligence of the agency assisting her. Specifically, the testimony establishes that the agency to which appellant was referred for housing had been "up and down" and had experienced personnel changes that involved transitional community workers, each of whom had to be "reconnected" with appellant's case. This gap in service resulted in at least a six-month delay in attention to her application. Neither is there any evidence of record that appellant is unwilling to provide clothing, food, or other necessities for the children.

{¶ 42} The remainder of R.C. 2151.414(E)(14) relates to a parent's willingness to shield a child from physical or sexual abuse or neglect. This ties to the (E)(1) finding because, as the complaint in this matter reveals, the only allegations related to appellant are (1) that she permits "people who are not appropriate to be around the children," (2) the "wrestling" with an 18–year–old now identified as Charlie T., (3) poor housekeeping, and (4) excessive use of physical discipline.

{¶ 43} Again, the unrefuted testimony from appellant's caseworkers and therapists is that she has been taking parenting classes and domestic-violence classes and participating in counseling and therapy well beyond that required of her case plan. She was actively involved in and engaged in these services and successfully completed, or was in the process of completing, all but one. The unsuccessful course was the interactive-parenting program. Even though appellant completed the entire course, she was deemed to have been unsuccessful in the course because of a disputed number of casual contacts with Uncle Charlie.

{¶ 44} Concerning appellant's support system, while the support of positive people can no doubt be helpful in raising children, the lack of, abundance of, or inability of a parent to "find" positive people should have no role in the termination of parental rights, and the substantial emphasis on this factor in the determination of the best interest of the children in this case is misplaced.

{¶ 45} We assume that the use of the word "wrestling" in the complaint was intended as some sort of euphemism. The use of euphemisms in a complaint is inadvisable, because we look to the complaint for the reason the children were removed.[1] Given its most liberal meaning, we take the term "wrestling" to mean some sort of vaguely sexual activity between Uncle Charlie and Kayla and Uncle Charlie and appellant as a trigger to Sean's violence. This is surely a good reason for appellant to remain clear of Uncle Charlie. But it appears from the unrefuted testimony at the termination hearing that this is what appellant did. There is absolutely no evidence that appellant ever again permitted Uncle Charlie to come into physical contact with herself, Kayla, or any of the other children. Indeed, there is testimony from appellee's witness that when Charlie arrived at a family Christmas party, appellant took the children and left. The guardian ad litem found that "[t]his shows insight and improvement on Mother's part."

{¶ 46} On this, we cannot say that there was sufficient evidence to support a finding that appellant failed to substantially remedy the conditions that caused the children to be removed, nor can we find evidence that appellant is unwilling to protect the children from physical or sexual abuse or neglect. Thus, the trial court's findings relative to R.C. 2151.414(E) are without support in the record.

12 of 22

{¶ 47} We have concluded that the evidence before the trial court supported none of the court's R.C. 2151.414(E) findings. Thus, the traditional statutorily defined characteristics of parental unfitness have not been demonstrated. In 1999, however, the Ohio legislature amended R.C. 2151.414, inserting a provision that bypasses the requirement of a finding of parental fitness. Am.Sub.H.B. No. 484 (effective March 18, 1999) added the "12 of 22" provision of R.C. 2151.413(D)(1) and 2151.414(B)(1)(d).

{¶ 48} R.C. 2151.413(D)(1) provides:

{¶ 49} "Except as provided in division (D)(3) of this section, if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-

---

1. We note that appellee also uses the words "perpetrator" and "sexual predator" loosely. There is no evidence of record that anyone related to this case has been criminally charged, let alone convicted or adjudicated a sexual predator.

two month period pending on or after March 18, 1999, the agency with custody shall file a motion requesting permanent custody of the child."

{¶ 50} R.C. 2151.414 provides:

{¶ 51} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

{¶ 52} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 53} " * * *

{¶ 54} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."

{¶ 55} In this matter, a 12 of 22 finding was entered with respect to these children.

{¶ 56} Given the strong language from the United States Supreme Court and the Supreme Court of Ohio concerning an antecedent finding of parental unfitness for a termination of parental rights, we have constitutional concerns about these provisions. The question has never been directly presented to this court, nor, it appears, to the Ohio Supreme Court. Those appellate courts that have addressed 12 of 22 have found it constitutional. *In re Unger Children,* 5th Dist. No. 04 CA 6, 2005-Ohio-2414, 2005 WL 1163915, ¶ 67; *In re Stillman,* 155 Ohio App.3d 333, 2003-Ohio-6228, 801 N.E.2d 475, ¶ 56; *In re Brooks,* 10th Dist. No. 04AP–164, 2004-Ohio-3887, 2004 WL 1631760, ¶ 32; *In re Workman,* 4th Dist. No. 02CA574, 2003-Ohio-2220, 2003 WL 2012574, ¶ 40; *In re Gomer,* 3d Dist. No. 16–03–19, 2004-Ohio-1723, 2004 WL 722978, ¶ 32. Moreover, the constitutionality of these statutes has not been raised in the present matter.

{¶ 57} Assuming the propriety of the 12 of 22 finding, we must then review the trial court's determination that permanent custody and legal custody are in the best interests of the children. This must be shown by clear and convincing evidence. R.C. 2151.414(B)(1). R.C. 2151.414(D) provides guidance in making this determination:

{¶ 58} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:

{¶ 59} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 60} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ 61} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

{¶ 62} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ 63} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 64} There is no question that Sean and Kayla are challenging adolescents and that the relationship with appellant's family has in the past been less than ideal. On the other hand, the testimony of appellant and her caseworkers and therapists suggests that she may have the skills to protect the children.

{¶ 65} The children, all adolescents, agree that they love their mother and want to be reunited with her. The court-appointed guardian ad litem concurs.

{¶ 66} The children were out of their mother's custody for 12 months when the motion for permanent custody was filed. Appellee's motion to terminate temporary custody came three months earlier. The guardian ad litem was convinced that the children could be placed with their mother with appellee providing protective services.

{¶ 67} No R.C. 2151.414(E)(7) through (11) factors apply to appellant.

{¶ 68} We are aware of no other compelling reasons why the family should not be reunited.

{¶ 69} If, as it appears, the legislature intended to substitute a mere amount of time as sufficient reason to terminate a parent's rights, see *In re Miqueal M.,* 6th Dist. No. L–02–1020, 2002-Ohio-3417, 2002 WL 1438664, ¶ 17, it is incumbent on the judiciary at all levels to examine with exacting scrutiny decisions flowing from this policy. Here, if anything, it was shown by clear and convincing evidence that these children should be reunited with their mother.

{¶ 70} Appellant's sole assignment of error is well taken.

{¶ 71} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed. This matter is remanded to that court for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal are awarded to Lucas County.

Judgment reversed.

HANDWORK and OSOWIK, JJ., concur.