[Cite as *In re A.E.*, 2016-Ohio-1392.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.E., B.E.

Court of Appeals No. L-15-1293

Trial Court No. JC 14244471

## DECISION AND JUDGMENT

Decided: March 31, 2016

* * * * *

Christopher S. Clark, for appellant.

Karen L. Bower, for appellee.

* * * * *

**JENSEN, P.J.**

{¶ 1} Appellant, K.J., appeals the October 13, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated her parental rights and awarded permanent custody of her children to Lucas County Children Services ("LCCS"). For the reasons that follow, we reverse the trial court's judgment.

# I. Background

{¶ 2} K.J. is the mother of A.E. (born October of 2008) and B.E. (born May of 2011). A.E. and B.E. were removed from K.J.'s care in June of 2012, after LCCS received information that she was not properly supervising them at the YWCA ("Y") apartment where they lived. LCCS learned around that time that K.J. had a history with child protection services in Michigan, she had other children removed from her care, her relationship with the children's father was violent, she had a history of housing instability, she had mental health disorders that were not being properly treated, and she failed to follow through with recommended parenting classes and Help Me Grow services for the children. She underwent a dual assessment through which she was diagnosed with major depressive disorder, ADHD, alcohol dependence (sustained full remission), and borderline personality disorder. She engaged in therapy, successfully completed interactive parenting classes, and engaged in (but did not complete) services at Project Genesis, an outreach program for women who are victims of domestic violence. The children were returned to her in October of 2013 under the protective supervision of LCCS.

{¶ 3} Following the return of the children to her care, K.J. experienced additional problems. She was evicted from the Y and was facing eviction from her next residence, Family House, due, in part, to her failure to supervise the children. She failed to follow up with therapy that had been arranged for A.E., and she admitted to a LCCS caseworker

2.

that she hits the children, sometimes with shoes or other objects. K.J. re-engaged in counseling and medication management.

{¶ 4} In November of 2014, K.J. called LCCS asking for respite care because she had been admitted to the hospital with respiratory issues and had no one to care for the children. She ultimately found a friend to care for them. About a week later, while she and the children were staying at another friend's home, her friend's boyfriend picked up A.E. by his face, threw him on the bed, and stomped on his back after A.E. wet the bed. The boyfriend was arrested that evening for assaulting his girlfriend as she cleaned the bed. This incident occurred in front of the children.

{¶ 5} Concluding that K.J. had failed to resolve the issues that had led to the children's removal in 2012, LCCS again removed the children from the home, and, on December 4, 2014, filed a complaint in dependency, neglect, and abuse in the Lucas County Court of Common Pleas, Juvenile Division. It sought an award of permanent custody. The court entered an order placing the children in the temporary custody of LCCS. Soon after, it appointed Sharon FitzGerald to serve as the children's attorney and guardian ad litem ("GAL"). On January 27, 2015, the GAL moved for the appointment of separate counsel for the children after they expressed their desire to return to one or both of their parents. James Popil was appointed to represent the children.

{¶ 6} A case plan was devised, but LCCS sought permanent custody and termination of parental rights because the children had been in substitute care for over a year prior to reunification in 2013, services had been offered and provided to the parents

3.

for over two-and-one-half years, and the children were still unsafe and at high risk. The GAL recommended that permanent custody be awarded to LCCS. She noted in her report and recommendation that the children had "bounced around" in housing, first with K.J., then in foster care; K.J. was not employed; K.J. was unable to keep her various apartments clean and free of litter; K.J. has difficulty getting herself to appointments and A.E. to school; K.J. has had problems with curfews and house rules at the shelters where she has lived, and has argued with fellow tenants; her children had vandalized the Y shelter several times; the children were being damaged by K.J.'s lifestyle and her treatment of them; and K.J. had not benefitted from the services LCCS provided to her.

{¶ 7} The case apparently proceeded to a hearing on February 26, 2015, on the motion for permanent custody, however, a transcript of that proceeding was not transmitted to this court. On June 4, 2015, the trial court denied that motion, concluding that LCCS did not establish at that time that permanent custody in favor of LCCS was in the children's best interest. The court set the matter for a disposition hearing to take place on July 7, 2015, because it also found "that it is not in the best interest of these children to have to wait indefinitely for permanency."

{¶ 8} A hearing apparently took place on July 7, 2015, but again, no transcript was provided to this court. According to the docket sheet transmitted to us by the trial court, the matter was continued for further review on August 12, 2015. That entry states: "Mother needs to address housing, work and how to figure out how to pay for everything. If items are not fixed the agency will proceed with PC."

4.

**{¶ 9}** The review took place as scheduled on August 12, 2015, and the trial court wanted an update on K.J.'s employment, housing, and the status of her visitation with the children. As to her employment, it was reported to the court that K.J. was working at the Cookie Factory and had plans to work at Wendy's. In preparation for eventual reunification, K.J. found a daycare provider to watch the children while she works. It was also reported that K.J. broke her foot and was unable to work the entire month of July.

**{¶ 10}** As to housing, K.J. had been living at an apartment, but there were issues with broken windows in need of repair. There were also issues with her ability to pay rent. K.J. made arrangements to paint the property in exchange for July rent, but because of her broken foot, she was unable to complete the painting. Her landlord began eviction proceedings. K.J. submitted applications at a number of subsidized housing complexes, but was contemplating living at the Crown Motel until she was able to find appropriate housing. K.J. represented to the court that no one was living with her or staying with her.

**{¶ 11}** As to visitation, the court was advised that K.J. regularly visits with the children on Wednesdays and that she took over the children's father's visitation time on Fridays because he was not using it. No overnight visits had occurred, however, because K.J. never obtained appropriate housing.

**{¶ 12}** As to the children's status, the court was informed that the children had been moved into new foster homes. A.E. was moved to a treatment home where he was doing well, and B.E. was in a foster home and doing fine.

{¶ 13} The court rescheduled the matter again for disposition on September 18, 2015, and it warned that the hearing on the motion for permanent custody would go forward. The court emphasized that "this thing needs to get done for these kids." It told K.J. that she could not have overnight visits with the kids at a motel.

{¶ 14} On August 25, 2015, LCCS filed a motion for permanent custody summarizing the progression of the case. It described that the court had been dissatisfied with the pace of K.J.'s progress, that A.E. was having behavior issues requiring treatment, that B.E. was experiencing stress from the lack of permanency, and that K.J. had not demonstrated that she can find a safe and stable permanent home for the children. LCCS acknowledged that K.J. was currently employed and had found housing, but it characterized her employment as sporadic and her housing as unstable. LCCS also expressed that K.J. continued to associate with men who posed a risk of harm to the children. It observed that despite K.J.'s claims that no one was living with her, 9-1-1 reports showed that police responded to her home after it was reported that a man named Jonathan Johnson, with whom she had been involved in the past, had threatened harm to K.J. and another man, Shawn Grant, whom K.J. was currently dating. LCCS claimed that K.J. was involved with Grant despite prior representations that he had moved out of town.

{¶ 15} The hearing on the motion for permanent custody went forward on September 18, 2015. Officer James Sutphin, of the Toledo Police Department, and LCCS caseworker, Theresa Thomas, were called by LCCS to testify. K.J. also testified,

6.

as did the GAL. Exhibits were entered into evidence, including police reports involving Johnson. The GAL and counsel for the children participated in this hearing as well.

### A. Officer Sutphin

{¶ 16} Officer Sutphin testified first. He provided details about a July 23, 2015 incident in which Johnson called the police, claiming that Grant threatened him. Johnson brought the responding officers to K.J.'s apartment. K.J. told the officers that Johnson was having a hard time because she broke up with him the week before. She showed the officers text messages from Johnson in which he threatened to stab Grant. The officers arrested Johnson and charged him with aggravated menacing. Before they left the house, Johnson packed "a garbage bag or two" full of his things, thereby suggesting that he had recently been living with K.J. It was the officers' belief that K.J., Johnson, and Grant all lived in K.J.'s apartment. LCCS offered into evidence a composite of police reports involving Johnson.

### B. Theresa Thomas

{¶ 17} Thomas testified that she does not believe that reunification with the mother can occur. She addressed K.J.'s housing and her relationships. With respect to housing, she said that K.J. was currently living on Spencer Street. There was a broken window that needed to be fixed to make the house structurally sound, as well as issues with her being two months past-due on rent and facing eviction. As to K.J.'s relationships, Thomas testified that she knows Grant from her previous employment with TASC working with people in the reentry program. She said that when she first visited

7.

the home on Spencer, Grant was at K.J.'s apartment sleeping on a mattress with another woman. K.J. claimed not to know his name. She later told LCCS that Grant left the state to work elsewhere. She never indicated that she was in a relationship with him. Thomas testified at the hearing, however, that she had been to K.J.'s apartment the day before, and saw Grant there, sitting on the porch with no shoes on, drinking a glass of soda. K.J. was not home. Grant told her that he and K.J. were working on their relationship, and he said that he had a key to the apartment. Thomas suggested that he come down to the agency so they could do a criminal background check and urine screen, but he did not.

{¶ 18} Thomas conceded that K.J. told her that the window had been fixed. She did not check to see if that was true despite being at the apartment the day before. Thomas also testified that although K.J. indicated that her rent was two months overdue and she was facing eviction, she had been calling 2-1-1 daily, trying to get into a shelter. K.J. asked for Thomas' help with this. K.J. also told Thomas that if she could not get into a shelter, she was exploring the possibility of moving to Crown Motel. Thomas told K.J. that it would be better to go to a shelter because the Crown Motel was not appropriate for the children. She acknowledged, however, that it can be difficult for a person in K.J.'s position to get into an emergency shelter where she can have her children when she does not currently have the children with her.

{¶ 19} Thomas discussed K.J.'s employment. She acknowledged that K.J. was currently employed by Wendy's and that she had been terminated from a prior position with the Cookie Factory after injuring her ankle at work. This was K.J.'s second injury

8.

while employed at the Cookie Factory. She worked there from April until August. Her job at Wendy's was new. She completed training but had not yet started working. She had to miss the first day she was scheduled to work because A.E. had a therapy session. Thomas described that K.J. was afraid she would lose her job as a result.

{¶ 20} Thomas acknowledged that K.J. completed the required parenting classes, had been undergoing the mental health treatment that was recommended of her, and obtained employment as LCCS expected of her. She visits with the children consistently on Wednesdays and began taking over the children's father's visits on Fridays. She missed the past few Fridays and was at risk of those visits being terminated. K.J. reported to Thomas that she is a week away from completing Project Genesis.

{¶ 21} Thomas confirmed that the children had been removed from foster homes five times. They were placed in separate homes four times and had only been placed together once. They are currently separated. The last time they were removed from their foster home was due to sexual abuse occurring in the house involving another child. Thomas agreed the children's behaviors had gotten worse in the last couple of months. She also agreed that the children are bonded to their mother and that it would be devastating to them not to see her in the future. She agreed that it was important to A.E. that K.J. be involved in his therapy appointments. So far, K.J. had been to two therapy sessions, and interacted well with A.E.

{¶ 22} As to Grant, Thomas conceded that she does not know his criminal history. She agreed that just because he was sitting on K.J.'s porch doesn't mean he lives there.

9.

Thomas acknowledged that K.J. has distanced herself from Johnson, and she agreed that Johnson is the individual about whom LCCS was most concerned.

{¶ 23} Thomas said that the impediments that remained were stable housing and K.J.'s association with individuals who pose a risk to the children. K.J. told Thomas that she did not know how long it would take before she could provide a safe, stable home for the children.

## C. K.J.

{¶ 24} K.J. indicated that she had not yet been evicted. She was served with the notice and has a court date. She reiterated that the broken windows in her apartment had been secured. She said her plan if evicted is to continue to call 2-1-1 twice a day in search of an open family shelter; otherwise she will go to a single shelter or a hotel. She identified the Days Inn in Bowling Green as another possible place she could stay for a while. She said that her sister would transport her to and from work. She has also submitted applications for other apartments.

{¶ 25} In terms of her sources of income, K.J. testified that when she is not working, she donates plasma. Her mother helps her with other staples like laundry, soap, toiletries, etc. To maintain stability in housing for the children, K.J. said that she plans to continue to work. She is also contemplating pursuing a wrongful termination claim against the Cookie Factory because she believes she was wrongfully fired because of her injury on the job. She expects to work 33 hours a week at Wendy's making minimum wage.

10.

**{¶ 26}** K.J. denied that she is in a relationship with Grant or Johnson. She said neither lives with her. She admitted that Johnson previously spent a couple nights at her place, but denies that he had a full bag of clothing there. She was unaware of his criminal history. He is currently in jail and she will not associate with him in the future.

**{¶ 27}** K.J. admitted that she and Grant are friends and that they are talking about pursuing a relationship. She conceded that Grant was staying there in July. She claimed that he was going to go to LCCS the day before for a urine screen and background check, but K.J. ended up not getting off work in time to accompany him.

**{¶ 28}** K.J. insisted that she is looking for a suitable home. She claimed that she has been concerned and diligent, but her injuries played a role in her inability to secure housing. She estimated that it would take her a couple of weeks to a month to find stable housing for the kids. She said that her mother and sister would help with the kids if needed.

**{¶ 29}** K.J. testified that she has six kids and none of them are with her. She conceded that she has only a mattress in her apartment.

## D. The GAL

**{¶ 30}** The GAL testified that she has been involved with the family for almost four years. She said that she recommended that the children be placed in the permanent custody of LCCS because they had lived in a series of homes, shelters, and motels. She said that they have never had any expectation of stability in their lives. She denied that K.J.'s family had any significant involvement with the children. She described that A.E.

11.

was having a lot of mixed feelings and was sometimes very angry and conflicted, while B.E. tended to withdraw. She talked about K.J. being inconsistent with the children and hitting them.

{¶ 31} The GAL acknowledged that a lot of the children's moving around occurred while they were in the custody of LCCS and that she could not guarantee that there would not be further disruptions if LCCS were to obtain permanent custody. She also acknowledged that K.J. loves her kids, but she said that the time had run out for her kids to wait.

### E. The Trial Court's Decision

{¶ 32} The trial court issued a ruling from the bench, granting LCCS's motion for permanent custody and terminating K.J.'s parental rights. It later memorialized its decision in a judgment entry journalized on October 13, 2015.

{¶ 33} In its judgment entry, the trial court summarized what it had expected of K.J.: that she maintain safe and stable housing because the children needed permanency. It explained that it had scheduled multiple reviews with the hope that visitation between K.J. and her children could begin in the home and with increasing frequency. The court described that each time, K.J. assured that she would do what was needed, however, the court found that K.J. still had not acquired safe, stable housing and it was persuaded that she would not do so within a reasonable time.

{¶ 34} The court also found that K.J. lacked any significant employment history and was unable to demonstrate that she can maintain a stable income to support herself

12.

and her children. Although she worked at the Cookie Factory for a few months, she was fired and had only just begun a job at Wendy's.

{¶ 35} The court observed that K.J. had exercised poor judgment in her recent relationships with two men and the court was especially concerned because she became pregnant by one of the men (but miscarried). The court was concerned that K.J. had allowed the two men access to the home where she intended to bring her children. The court found that one of the men was especially violent and presented a risk to K.J., her associates, and her children, as evidenced by the 9-1-1 call described by Officer Sutphin, and as further evidenced by the criminal history entered into evidence.

{¶ 36} The court found that the children needed permanency and that K.J. was aware that the court would be considering permanency on an ongoing basis following its initial entry of temporary custody to LCCS. The court also found that an award of custody to LCCS would facilitate the search for an adoptive home for the children and would be in the best interest of the children because they need a "forever home" and more than just temporary foster placement. It concluded that K.J. had not made significant progress towards being able to provide such a home.

{¶ 37} The court determined that there was clear and convincing evidence that K.J. had failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home despite diligent efforts by LCCS. It further determined by clear and convincing evidence that K.J. demonstrated a lack of commitment toward the children by allowing into her home men whose nature put her

13.

children at risk of harm. It found that it was in the children's best interest that permanent custody be awarded to LCCS given the family's history with child protection services, and it concluded that K.J. had not shown that she can provide safe, stable housing, that the children could not and should not be placed with a parent within a reasonable time, and that an award of permanent custody of the children is in the children's best interest. It terminated K.J.'s parental rights.

{¶ 38} K.J. appealed the trial court's decision and assigns the following errors for our review:

I. THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF THE APPELLANT-MOTHER, AND AWARDING PERMANENT CUSTODY TO LUCAS COUNTY CHILDREN SERVICES, AS THE DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF THE APPELLANT-MOTHER, AND AWARDING PERMANENT CUSTODY TO LUCAS COUNTY CHILDREN SERVICES, BASED UPON A DETERMINATION THAT THE CHILDREN COULD NOT BE PLACED WITH ONE OF THE CHILDREN'S PARENTS WITHIN A REASONABLE TIME AND THAT PERMANENT CUSTODY IS IN THE CHILDREN'S BEST INTEREST. [R.C. 2151.414(B)(2)].

## II. Law and Analysis

{¶ 39} In her first assignment of error, K.J. argues that the trial court's decision to terminate her parental rights and to award permanent custody to LCCS was against the manifest weight of the evidence. In her second assignment of error, she claims that the trial court erred in its conclusion that the children could not be placed with one of their parents within a reasonable time and that permanent custody is in the children's best interest. Because these assignments of error are related, we address them together.

{¶ 40} R.C. 2151.414 provides the analysis that a court must undertake when considering whether to terminate parental rights and vest permanent custody in a children's service agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists. Subsection (b) of that provision requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; and subsection (d) requires a finding that the child has been in the temporary custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 14-15.

15.

{¶ 41} If the court finds that R.C. 2151.414(B)(1)(b), (c), or (d) applies, it must next determine whether granting permanent custody to the agency is in the child's best interest. This requires the court to evaluate the factors enumerated in R.C. 2151.414(D)(1). *In re K.M.D.*, 4th Dist. Ross. No. 11CA3289, 2012-Ohio-755, ¶ 30. If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43. The court need not find that any of the R.C. 2151.414(E) factors are present if it relies on R.C. 2151.414(B)(1)(b)-(d) as the basis for granting permanent custody to LCCS.

{¶ 42} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S.,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

{¶ 43} The trial court found that R.C. 2151.414(B)(1)(a) applied, and undertook an analysis of whether any section (E) factor applied, indicating that the children cannot

16.

be placed with either parent within a reasonable time or should not be placed with either parent. It went on to determine whether under section (D)(1), granting permanent custody to ODJFS was in the children's best interest.

{¶ 44} The trial court found that both R.C. 2151.414(E)(1) and (4) applied. Those sections provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

17.

{¶ 45} With respect to R.C. 2151.414(E)(1), the trial court found simply that K.J. had not remedied the conditions causing the children to be removed from the home, despite diligent efforts by LCCS. With respect to R.C. 2151.414(E)(4), the trial court found that K.J. had demonstrated a lack of commitment to the children by allowing into her home men whose nature would put the children at risk of harm.

{¶ 46} Turning to the factors to be considered in determining the best interest of the children, the trial court's decision indicates that it considered the R.C. 2151.414(D)(1) factors, and that it found R.C. 2151.414(D)(1)(d)—the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency—to be particularly applicable. The court explained:

> These children were removed from their mother's care in June of 2012 and then returned to her legal custody in October of 2013, under the protective supervision of the L.C.C.S., and then were removed again in November of 2014. While in the mother's care following reunification, they lived first in an apartment at the YWCA and then in a shelter (Family House) when she was evicted from the Y. Since leaving the shelter, [K.J] has not shown that she can provide safe, stable housing, and this situation has gone on for most of this year. * * *.

{¶ 47} It is clear to us that the trial court paid close attention to this case, conducted numerous reviews and hearings, and clearly communicated its expectations to

K.J. We reluctantly conclude, however, that the testimony presented at the September 18, 2015 hearing did not clearly and convincingly support the trial court's findings.

{¶ 48} The trial court expected K.J. to secure stable employment and housing, and that she avoid acquaintances that posed risk to K.J. and her children. The evidence presented at the September 18, 2015 hearing made clear that K.J. had been working at the Cookie Factory from April until August, but suffered a broken foot, preventing her from working for most of July, and leading to her termination on August 13, 2015. She promptly found a new job at Wendy's, where she expected to work 33 hours per week, and she had a plan for child care. None of this information was in dispute.

{¶ 49} As to her housing, K.J. secured an apartment on Spencer Street. There were concerns about a broken window at the apartment, but K.J. testified that the window had been repaired and there was no testimony to dispute this. Prior concerns about cleanliness had been resolved. While it is true that eviction proceedings had been filed, at the time of the hearing, she had not yet been evicted. She explained that the financial consequences of her broken foot and difficulties caused by a change in ownership of the building led to the filing of the eviction proceedings. With that possibility looming, K.J. diligently searched for a shelter that would accommodate her and her children (a difficult task given that she had not yet been reunified with her children), requested LCCS assistance in conducting a search for shelter, submitted a variety of applications for housing, and looked for affordable motels that would not cause the safety concerns posed

19.

by the Crown Motel. While we recognize and agree with the trial court's objective of establishing permanence for the children, the setbacks K.J. experienced in her search for stable housing do not appear to have been caused by any unwillingness or lack of effort on K.J.'s part.

{¶ 50} The GAL in this case seems quick to blame K.J. for the setbacks she experienced ("[K.J.] seems unable to maintain her own health, as she managed to break bones in rapid succession, [and] be in and out of the hospital for various problems, including a variety of respiratory complaints."). We, however, recognize the devastating effect that an unexpected health condition can have on a family, particularly when that family is of limited means.

{¶ 51} Turning to K.J.'s choice in acquaintances, it was established that Johnson had violent tendencies, but it was not established that K.J. knew this or that Johnson remained in K.J.'s life after his arrest for aggravated menacing in July of 2015. To the contrary, the undisputed evidence established that Johnson was in jail and that K.J. was no longer in contact with him. As to Grant, Thomas testified that she recognized him from her employment with TASC and the reentry program, but she was unable to provide any testimony whatsoever that Grant posed a risk to K.J. or her children. She had no information about the nature or extent of Grant's criminal background. And while Grant had not immediately submitted to a background check and a urine test at LCCS, Thomas' testimony established that the request had been made of Grant only the day before the hearing.

20.

**{¶ 52}** "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.'" *In re Sean B.,* 170 Ohio App.3d 557, 2007-Ohio-1189, 868 N.E.2d 280, ¶ 28 (6th Dist.), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). The burden is on the party seeking permanent custody to prove each element of its case by clear and convincing evidence. *In re Alexis K.,* 160 Ohio App.3d 32, 2005-Ohio-1380, 825 N.E.2d 1148, ¶ 46 (6th Dist.). We conclude that LCCS failed to meet its burden. We, therefore, find K.J.'s assignments of error well-taken.

### III.  Conclusion

**{¶ 53}** We find K.J.'s assignments of error well-taken. We reverse the October 13, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division, and remand for further proceedings consistent with this decision. The costs of this appeal are assessed to LCCS pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                                _____

                                                              JUDGE

Thomas J. Osowik, J.           

                                     _____

James D. Jensen, P.J.                                             JUDGE
CONCUR.

                                     _____

                                               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.